UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 20-41555-11 |
| YACHT CLUB VACATION OWNERS | ) | |
| ASSOCIATION, INC., | ) | Chapter 11 proceedings |
| | ) | Hon. Brian T. Fenimore |
| Debtor. | ) | |

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on January 29, 2021, the debtor and debtor in possession, Yacht Club Vacation Owners Association, Inc., filed the following motion, which is attached:

1. Debtor's Motion for Order Authorizing Sale of All Interests in the Yacht Club Condominiums Free and Clear of All Interests, Pursuant to 11 U.S.C. § 363, Approving Bidding Procedures, and Authorizing Stalking Horse Contract and Break Up Fee

Any response to the motion must be filed within 21 days of the date of this notice, pursuant to L.R. 9013-1C, with the Clerk of the United States Bankruptcy Court. Parties represented by an attorney shall file electronically at https://ecf.mowb.uscourts.gov. Pro se parties shall mail filings to: United States Bankruptcy Court, Western District of Missouri, 400 East 9th Street, Room 1510, Kansas City, MO 64106.

Pursuant to L.R. 9013-1D, responses shall address the merits of the motion and, if applicable, set out actions to remedy the particular problem. The Court will serve such response electronically on the Trustee, debtor's attorney and all other parties to the case who have registered for electronic filing. Respondent shall serve all parties not served electronically.

If a response is timely filed, a hearing will be held on a date and time determined by the Court. Notice of such hearing will be provided to all parties in interest. If no response is filed within 21 days, the Court will enter an order.

For information about electronic filing go to www.mow.uscourts.gov or call the Court's
HELP line at 1-800-466-9302.

Dated: January 29, 2021.

*/s/ Daniel D. Doyle*
Daniel D. Doyle               36724MO
LASHLY & BAER, P.C.
714 Locust Street
St. Louis, MO  63101
(314) 621-2939 (Telephone)
(314) 621-6844 (Facsimile)
ddoyle@lashlybaer.com

*Counsel for Debtor*

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 20-41555-11 |
| YACHT CLUB VACATION OWNERS | ) | |
| ASSOCIATION, INC., | ) | Chapter 11 proceedings |
| | ) | Hon. Brian T. Fenimore |
| Debtor. | ) | |

**DEBTOR'S MOTION FOR ORDER AUTHORIZING SALE OF ALL INTERESTS IN THE YACHT CLUB CONDOMINIUMS FREE AND CLEAR OF ALL INTERESTS, PURSUANT TO 11 U.S.C. § 363, APPROVING BIDDING PROCEDURES, AND AUTHORIZING STALKING HORSE CONTRACT AND BREAK-UP FEE**

Yacht Club Vacation Owners Association, Inc., debtor and debtor in possession, ("Debtor"), for its Motion, states:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. §§ 363 and 365.

2.      This is a core proceeding under 11 U.S.C. § 157(b)(2)(A), (N), and (O).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

**BACKGROUND**

4.      On August 28, 2020, the Debtor filed its chapter 11 petition under Subchapter V of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Petition Date").

5.      The Debtor has continued to maintain, manage and operate a timeshare community, the Yacht Club Vacation Condominiums, at 611 Rock Lane Drive, Branson, Missouri (the "Condominiums") pursuant to 11 U.S.C. §1107 and §1108.

6.      A legal description of the Condominiums and a description of furniture, fixtures and equipment to be sold pursuant to this Motion (the "Assets") is attached as **Exhibit A.**

7.      The Debtor subsequently negotiated an Asset Purchase Agreement (the "Stalking Horse APA") with General Management VII, LLC, (the "Stalking Horse Purchaser") for the sale of the Assets for One Million One Hundred Thousand Dollars ($1,100,000.00), subject to higher and better bids at auction. A copy of the Stalking Horse APA is attached as **Exhibit B**.

8.      The Debtor employed Fisher Auction Company to market the Assets, which will continue to market the Assets until the online auction date.

9.      The Debtor filed an adversary proceeding on November 23, 2020, seeking a judgment to enable the transfer of interests the Condominiums currently held by timeshare owners, and for related declaratory judgment.

10.     None of the more than 400 defendants in the adversary proceeding, *Yacht Club Vacation Owners Association, Inc. v. Aabano*, et al., Adv. No. 20-03020, (the "Adversary Proceeding") opposed the granting of the relief sought. The Debtor has filed for default judgment and for judgment on the pleadings to obtain the relief sought to enable the sale of all interests in the Condominiums.

11.     The Debtor has no secured creditors and no liens are asserted in the Condominiums. The value of the Condominiums, if marketed as a timeshare property instead of a conventional condominium complex, is believed to be zero.

**SALE OF ASSETS FREE AND CLEAR OF ALL INTERESTS PURSUANT TO SECTION 11 U.S.C. §363(b), (f), and (h)**

12.     The Debtor requests that the Court authorize the sale of the Assets pursuant to 11 U.S.C. §363(b)(1) free and clear of all interests, with all such interests attaching to the sale proceeds, including all timeshare interests.

13.     Section 363(b) authorizes the sale of property of the estate other than in the ordinary course of business after notice and a hearing.  A sale of assets outside the ordinary course of business is a matter within the Court's discretion.  Courts permit a debtor to sell property of the estate outside of the ordinary course where the proposed sale is a sound exercise of the debtor's business judgment and when such sale is for fair and reasonable consideration and is in good faith. *See, e.g., In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983).

14.     A sale free and clear of interests, including liens, claims and encumbrances is permissible if, among other things, (i) applicable non-bankruptcy law permits sale of such property free and clear of such interest, or (ii) the secured lienholder consents, or (iii) the price at which the property is to be sold is greater than the aggregate value of all liens in the property.

15.     The proposed sale of the Assets to the Stalking Horse Purchaser would be for fair and reasonable consideration, is in good faith and will not unfairly benefit any insiders or creditors of the Debtor. Missouri law permits the sale, and the sale price is greater than the liens in the property.

## PROPOSED SALE PROCEDURES AND BREAK UP FEE

16.     The best interests of the estate and its creditors and stakeholders would be served by this Court's approval of proposed sale procedures.

17.     The Debtor, in attempting to obtain the highest and best offer for the purchase of the Assets, requests Bankruptcy Court approval of sale and bidding procedures (the "Bid Procedures"), which will ensure all competing bidders at auction are financially qualified and that the auction and bid process is fair, equitable, and efficient. The Bid Procedures, which include instructions to bidders, informational forms, and form APA, are attached as **Exhibit C**.

18.     Consistent with the terms of the Stalking Horse APA, the Debtor seeks approval of an expense reimbursement or break-up fee for the Stalking Horse Purchaser of ($33,000.00) (the "Break-Up Fee") to compensate the Stalking Horse Purchaser for fees and costs incurred by the Stalking Horse Purchaser in connection with conducting due diligence, negotiating and executing the Stalking Horse APA, and other activities, if the Purchaser is not the successful bidder.

19.     The Bid Procedures require an initial overbid of at least $50,000, which is high enough to pay the Break-Up Fee but low enough to avoid chilling the bidding at auction.

20.     The Break-Up Fee is reasonable in amount and would fairly compensate the Stalking Horse Purchaser for the time and effort it invested, and for time and effort Purchaser has and will incur prior to a sale hearing.  The Stalking Horse APA is key to obtaining the highest possible price because it establishes a reasonable opening bid at the online auction.

WHEREFORE, the Debtor prays the Court enter an Order:  (i) authorizing the auction sale of the Condominiums free and clear of all interests under Section 363 of the Bankruptcy Code, including the interests of all timeshare owners consistent with the judgments entered or to be entered in the Adversary Proceeding; (ii) approving the attached Bid Procedures, including the terms of the form APA that must be acknowledged by any bidders; (iii) authorizing the Debtor to execute the Stalking Horse APA, including agreement to its bid protections; (iv) setting a final hearing to approve the sale after the auction; and (v) providing for such other and further relief as is just and proper.

Dated: January 29, 2021.

By: */s/ Daniel D. Doyle*       
Daniel D. Doyle     36724MO
Scott A. Pummell    66164MO
LASHLY & BAER, P.C.
714 Locust Street
St. Louis, MO  63101
Telephone: (314) 621-2939
FAX:  (314) 621-6844
ddoyle@lashlybaer.com
spummell@lashlybaer.com

*Counsel for Debtor*

<u>Certificate of Service</u>

The undersigned certifies that a true copy of the foregoing was served via the Court's ECM/ECF system on all parties requesting electronic notice, and by U.S. Mail, first-class postage prepaid, on all other creditors and parties interest on the attached list, on the 29th day of January 2021.

      */s/  Daniel D. Doyle*

LEGAL DESCRIPTION- PARCEL FOR BUILDING 1:

A TRACT OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼; THENCE N 01°50'42" E, A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8' IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E, A DISTANCE OF 500.48 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-23; ALONG THE GOVERNMENT FEE TAKING LINE FOR TABLE ROCK LAKE AS FOLLOWS: THENCE S 43°16'36" E, A DISTANCE OF 443.55 FEET TO THE NEW POINT OF BEGINNING; THENCE CONTINUING S 43°16'36" E, A DISTANCE OF 15.29 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-24; THENCE S 62°20'33" E, A DISTANCE OF 85.96 FEET; THENCE S 27°39'27" W, LEAVING THE GOVERNMENT FEE TAKING LINE, A DISTANCE OF 52.00 FEET; THENCE N 62°20'33" W, A DISTANCE OF 120.11 FEET; THENCE N 46°43'24" E, A DISTANCE OF 60.30 FEET TO THE NEW POINT OF BEGINNING; CONTAINING 5819 SQUARE FEET OF LAND, MORE OR LESS, TOGETHER WITH AND SUBJECT TO AN INGRESS AND EGRESS EASEMENT DESCRIBED BELOW AND SUBJECT TO ALL OTHER EASEMENTS AND RESTRICTIONS OF RECORD.

INGRESS AND EGRESS EASEMENT:

AN INGRESS AND EGRESS EASEMENT LYING OVER AND ACROSS A PARCEL OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE 1/4; THENCE N 01°50'42" E, A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01 °59'49" E, A DISTANCE OF 140.99 FEET TO THE SOUTH TERMINUS OF AN
EXISTING COUNTY ROAD FOR A NEW POINT OF BEGINNING; THENCE CONTINUING N 01°59'49" E, A DISTANCE OF 40.00 FEET TO THE NORTH TERMINUS OF THE EXISTING COUNTY ROAD; THENCE N 79°52'48 "E, A DISTANCE OF 43.37 FEET; THENCE S 85°58'41 "E, A DISTANCE OF 39.12 FEET; THENCE S 89°10'44" E, A DISTANCE OF 32.00 FEET; THENCE N 87°05'47" E, A DISTANCE OF 68.10 FEET; THENCE N 46°43'24" E, A DISTANCE OF 18.51 FEET; THENCE S 43°16'36" E, A DISTANCE OF 64.38 FEET; THENCE S 56°07'49" E, A DISTANCE OF 36.40 FEET; THENCE N 46°43'24" E, A DISTANCE OF 2.38 FEET; THENCE S 62°20'33" E, A
DISTANCE OF 67.33 FEET; THENCE N 77°43'50" W, A DISTANCE OF 95.81 FEET; THENCE N 66°12'54" W, A DISTANCE OF 77.15 FEET; THENCE S, 19°49'04" W, A DISTANCE OF 79.08 FEET; THENCE N 40°54'33" W, A DISTANCE OF 55.03 FEET; THENCE N 63°49'16" W. A DISTANCE OF 61.65 FEET; THENCE S, 79°06'09" W, A DISTANCE OF 50.85 FEET TO THE NEW POINT OF BEGINNING; CONTAINING 0.32 ACRES OF LAND, MORE OR LESS.

SUBJECT TO THE NOTES AND OTHER INDICATED RESTRICTIONS, IF ANY, ON SAID PLAT OR PLATS AND SUBJECT TO THE CONDITIONS, COVENANTS, RESERVATIONS, EASEMENTS, CHARGES AND LIENS REFLECTED IN THE ORIGINAL DECLARATION AND SUPPLEMENTAL DECLARATIONS FILED IN CONNECTION THEREWITH IN THE OFFICE OF THE CLERK OF COURT IN AND FOR STONE COUNTY, MISSOURI.

LEGAL DESCRIPTION-PARCEL FOR BUILDING 2:

A TRACT OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST OF THE FIFTH PRINCIPAL MERIDIAN, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼ SAID SECTION 5, THENCE N 01°50'42" E A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E A DISTANCE OF 500.48 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-23; THENCE S 43°16'36" E ALONG THE GOVERNMENT FEE TAKE LINE FOR TABLE ROCK LAKE A DISTANCE OF 458.84 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-24; THENCE S 62°20'33" E A DISTANCE OF 85.96 FEET TO THE POINT OF BEGINNING; THENCE S62°20'33"E A DISTANCE OF 96.26 FEET; THENCE LEAVING THE GOVERNMENT FEE TAKE LINES 27°39'27" W A DISTANCE OF 52.00 FEET; THENCE N 62°20'33" W A DISTANCE OF 96.26 FEET; THENCE N 27°39'27" E A DISTANCE OF 52.00 FEET TO THE POINT OF BEGINNING, CONTAINING 5,006 SQUARE FEET OR 0. 115 ACRES MORE OR LESS, TOGETHER WITH AN INGRESS AND EGRESS EASEMENT DESCRIBED BELOW AND SUBJECT TO ALL OTHER EASEMENTS AND RESTRICTIONS OF RECORD.

INGRESS AND EGRESS EASEMENT DESCRIPTION:

AN INGRESS AND EGRESS EASEMENT LYING OVER AND ACROSS A PARCEL OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST OF THE FIFTH PRINCIPAL MERIDIAN, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼ SAID SECTION 5, THENCE N 01°50'42" E A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E A DISTANCE OF 140.99 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE SOUTH TERMINUS OF AN EXISTING COUNTY ROAD; THENCE N 01°59'49" E A DISTANCE OF 40.00 FEET TO THE NORTH TERMINUS OF THE EXISTING COUNTY ROAD; THENCE N 79°52'48" E A DISTANCE OF 43.37 FEET; THENCE S 85°58'41" E A DISTANCE OF 39.12 FEET; THENCE S 89°10'44" E A DISTANCE OF 32.00 FEET; THENCE N 87°05'47" E A DISTANCE OF 68.10 FEET; THENCE N 46°43'24" E A DISTANCE OF 18.51 FEET;
THENCE S 43°16'36" E A DISTANCE OF 64.38 FEET; THENCE S 56°07'49" E A DISTANCE OF 36.40 FEET; THENCE N 46°43'24" E A DISTANCE OF 2.38 FEET; THENCE S 62°20'33" E A DISTANCE OF 120.11 FEET; THENCE S 62°20'33" E A DISTANCE OF 96.26 FEET; THENCE S 27°39'27" W A DISTANCE OF 20.00 FEET; THENCE N 62°20'33" W A DISTANCE OF 221.71 FEET; THENCE N 77°43'50" W A DISTANCE OF 20.44 FEET; THENCE N 66°12'54" W A DISTANCE OF 77.15 FEET; THENCE S 19°49'04" W A DISTANCE OF 79.08 FEET; THENCE N 40°54'33" W A DISTANCE OF 55.03 FEET; THENCE N 63°49'16" W A DISTANCE OF 61.65 FEET; THENCE S 79°06'09" W A DISTANCE OF 50.85 FEET TO THE POINT OF BEGINNING (SOUTH TERMINUS OF THE EXISTING COUNTY ROAD), CONTAINING 0.405 ACRES MORE OR LESS.

**EXHIBIT A**

# ASSET PURCHASE AGREEMENT

## 1. Parties.

The parties to this Asset Purchase Agreement (the "**Agreement**") are Yacht Club Vacation Owners Association, Inc., Chapter 11 Debtor and Debtor in Possession, (the "**Association**" or the "**Seller**"), and General Management VII, LLC, a Delaware Limited Liability Company and/or Assigns (the "**Buyer**"). The Seller and the Buyer are each individually a "**Party**," and collectively the "**Parties**," to this Agreement.

## 2. Preliminary Statement.

On August 28, 2020, (the "**Petition Date**"), the Association filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), designated as Case No. 20-41555-11 in the United States Bankruptcy Court for the Western District of Missouri, Southwestern Division (the "**Bankruptcy Court**"). The Association is a not-for-profit corporation created in 2002 to manage, operate and maintain the Two (2) Six (6) Unit Vacation Condominium Properties in the Rock Lane Resort at 611 Rock Lane, Branson, Missouri 65616, pursuant to the Supplemental Declaration of Covenants and Restrictions for Yacht Club Condominiums (the "**Timeshare Plan Declaration**") filed on or about March 27, 2002, and recorded in Deed Book 411 at pages 143-192, in Stone County with the Office of the Recorder of Deeds, as subsequently supplemented and amended. Subject to the Bankruptcy Court's approval, the Seller desires to sell and otherwise transfer to the Buyer, and the Buyer wishes to buy the Two (2) Six (6) Unit Vacation Condominium Properties in the Timeshare Plan, the legal descriptions for which are set forth on Schedule 2-A of this Agreement (the "**Condominiums**"), including the Association's undivided deeded interests in the Condominiums and those of all other timeshare owners in the Condominiums, and all furnishings, fixtures, and equipment used to operate the Condominiums. Buyer shall not assume any liabilities of the Seller of any kind unless Buyer agrees otherwise in writing.

## 3. The Purchase Price

Buyer agrees to purchase the Condominiums and to pay to the Seller at the Closing by delivery of cash payable by wire transfer One Million One Hundred Thousand and 00/100 Dollars ($1,100,000.00) (the "**Purchase Price**") payable as follows, (i) upon approval and execution of the Agreement the Buyer shall provide an earnest money deposit of $100,000.00 (the "**Stalking Horse Deposit**"), which will be held in the trust account of the Seller's attorney, Lashly & Baer, P.C., as Escrow Agent, and (ii) the balance of the Purchase Price, after crediting the Stalking Horse Deposit, will be paid by wire transfer at the Closing.  In addition to the Purchase Price, the Buyer shall pay a "buyer's premium" equal to seven percent (7%) of the Purchase Price (the "**Buyer's Premium**"), to be paid with the Purchase Price at Closing.  The total of the Purchase Price and the Buyer's Premium shall constitute the "**Total Purchase Price**" to be paid by the Buyer.

# EXHIBIT B

DocuSign Envelope ID: A3CBA2A4-F58d-45A4-A4E9-449849B3F21C

**4. The Condominiums**.

Upon Bankruptcy Court approval of the sale, the Seller shall transfer, assign and convey a quit-claim deed to the Condominiums, which are identified as unit numbers: 135 A/B, 137 A/B, 139 A/B, 141 A/B, 143 A/B and 145 A/B of Building 1 and 147 A/B, 149 A/B, 151 A/B, 153 A/B, 155 A/B and 157 A/B of Building 2, and as legally described on Schedule 2-A.

**5. "As Is" Condition**

The Buyer specifically acknowledges and agrees that the Condominiums are being sold in an "AS IS" condition, with specific acknowledgement of the disrepair of stairwells, as of the Closing Date.

**6. Bankruptcy Proceedings**.

This Agreement is subject to approval of the Bankruptcy Court, and all applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court. This Agreement is effective only if it is the highest and best bid for the Condominiums after bidding and auction procedures to be approved by the Bankruptcy Court.

Seller shall file a motion with the Bankruptcy Court (the "**Sale Motion**") seeking authority to consummate the transaction contemplated hereunder, subject to topping bids, to be provided in an order (the "**Sale Order**") that (a) authorizes the sale of the Condominiums to the Buyer, if the successful bidder, free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. §§ 363(b), 363(f), and 363(h) with all liens, charges, claims and encumbrances to attach to the sale proceeds of the Condominiums, and (b) provides that (i) the Buyer has acted in "good faith" within the meaning of 11 U.S.C. § 363(m), (ii) the sale was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (iii) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to the sale of the Condominiums or this Agreement, or any breach hereof, and (iv) the terms of this Agreement and the transaction contemplated thereby may be specifically enforced against and binding upon the Parties, and not subject to rejection or avoidance by the Association. The Sale Order shall further provide that the Buyer is not a successor to the business of the Association; that the purchase price represents a fair market value of the Condominiums; that the Buyer shall have no liability for any obligations of the Association; and that the automatic 14- day stay under Rule 6004 of the Federal Rules of Bankruptcy Procedures shall not apply to the Sale Order.

The Seller shall also file with the Sale Motion a companion motion (the "**Bidding Procedures Motion**") seeking to establish bidding procedures and certain bid protections (the "**Bidding Procedures**") for the Buyer, which is acting as the "**Stalking Horse Bidder**" in the Seller's sale of the Condominiums.  The Bidding Procedures Motion shall seek the approval of the Bidding Procedures pursuant to an order substantially in the form of the proposed order (the "**Bidding Procedures Order**") including the Stalking Horse Bidder Protections set forth below.

The Buyer shall be named the Stalking Horse Bidder under the Bidding Procedures. As part of the sale process by which the Seller is duty-bound to attempt to obtain the highest and best sale price for the Condominiums, the Seller will market the Condominiums and solicit purchase offers at a greater price (an "**Overbid**") than the Purchase Price (defined hereinbelow), by and through an online auction (the "**Auction**") to be conducted by Fisher Auction Company ("**Fisher**"), as the Auctioneer. Fisher will market and promote the auction for at least 60 days, at the end of which the Auction shall be conducted. The Auction terms shall provide that the auction bids must be in an amount sufficient to constitute an Overbid. If an Overbid is received, the Buyer may participate in the auction bidding if it chooses, but it shall have no obligation to participate in the Auction. The Auction shall be conducted on the date specified in the Bidding Procedures Order, no more than two (2) business days prior to the hearing on the Sale Motion.

In the event the Stalking Horse Bid is the highest and successful bid for the Condominiums, Fisher shall receive payment of their fees from the Buyer's Premium paid by the Buyer. Similarly, in the event that the highest and best bid is received from the Auction, Fisher will be paid their fees by the prevailing Overbid purchaser, from the Buyer's Premium, in the amount of seven percent (7%) of the successful bid; the successful bid amount plus the Buyer's Premium shall constitute the Total Purchase Price to be paid by the prevailing Overbid purchaser. The fees paid to Fisher from the Buyer's Premium are in addition to, and not included in, the marketing expense reimbursement paid by the Seller to Fisher for the marketing and promotion of the Auction.

The Bid Procedures Order shall contain the following "**Stalking Horse Bidder Protections**":

(a) Any initial Overbid must provide for aggregate consideration to the Seller of at least $50,000.00 more than the Purchase Price in this Agreement, with subsequent bid increments determined by Fisher, as Auctioneer, in its reasonable discretion.

(b) Any initial Overbid must: (i) be accompanied by an initial deposit of One Hundred Thousand Dollars ($100,000.00) (the "**Bidder Deposit**"); (ii) immediately following the Auction, be supplemented by an additional deposit so that the bidder's total deposit is in the amount of ten percent (10%) of the Total Purchase Price offered by that bidder (the "**Deposit**"), provided by Wire Transfer, which amount shall be held in escrow in the trust account of the Seller's attorney, Lashly & Baer, P.C., acting as Escrow Agent for the Deposit; and (iii) satisfactory proof of the bidder's financial qualifications;

(c) A party submitting an initial Overbid complying with these provisions and with any other requirements contained in the Bidding Procedures Order, including submission of the items listed in the Instructions for Bidder Qualification approved in the Bidding Procedures Order, shall be deemed a "**Qualified Bidder.**" The Buyer shall be deemed a Qualified Bidder upon making the Stalking Horse Deposit and executing this Agreement;

(d) Only the Seller, any Qualified Bidder, the Buyer, and their respective counsel and advisors may participate in the Auction;

(e) At the conclusion of the Auction the prevailing bidder shall submit the executed, Bankruptcy Court approved form of Asset Purchase Agreement with the successful auction price to the Seller for final approval by the Bankruptcy Court; and

(f) If the Bankruptcy Court approves and the Seller sells the Condominiums to someone other than the Buyer, the Seller shall pay the Stalking Horse Bidder a breakup fee of three percent (3%) of its initial bid, or $33,000 (the "**Breakup Fee**"). The Breakup Fee shall be (i) an allowed administrative expense under Section 503(b) of the Bankruptcy Code, and shall be paid out of the gross proceeds of the sale or transaction; and shall be (ii) payable on the second business day following the date that the sale closes.

## 7. Closing.

The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place via the exchange of documents and the remittance of the Total Purchase Price to the Seller, which exchange and payment shall be deemed to occur at the offices of the Seller's attorney, in St. Louis, Missouri, and commencing at 9:00 a.m. local time on the fifteenth (15th) day following entry of the Sale Order, or on such earlier date at the Parties may agree if the Sale Order includes a finding and order provision that the good faith protections under Section 363(m) of the Bankruptcy Code are applicable to the transaction and to the Buyer (the "**Closing Date**"), but in all events no later than thirty (30) days following the entry of the Sale Order.

At Closing, the Seller will deliver to the Buyer:

   (a) a quit-claim deed for the 12 condominium units, legally described on Schedule 2-A;
   (b) a bill of sale for all related furnishings, fixtures and equipment as described on Schedule 2-B of this Agreement; and
   (c) any document necessary for the title company to issue a title insurance policy.

At Closing, the Buyer shall deliver to the Seller the remaining cash portion of the Total Purchase Price described above; the Stalking Horse Deposit shall be released from escrow to the Seller if the Buyer is the successful bidder.

Any taxes due on the Condominiums shall be prorated as of 12:01 a.m. on the Closing Date, with all such items attributable to period prior to 12:01 a.m. on the Closing Date being for the sole account of the Seller and all such items attributable to periods after 12:01 a.m. on the Closing Date being for the sole account of the Buyer. If the actual taxes are not available to determine the proration at the Closing Date, the proration shall occur based upon the most recent tax amounts available. The Buyer and the Seller shall furnish each other with such documents and other records as shall be reasonably requested in order to confirm all proration calculations. This provision shall survive the Closing.

## 8. Representations and Warranties Concerning the Buyer.

The Buyer represents and warrants to the Seller that the statements contained in this Section are correct and complete as of the date of this Agreement and will be correct and complete as of the

DocuSign Envelope ID: A3CBA2A4-F584-45A4-A4E9-449049B3F21C

Closing Date (as though made then, and as though the Closing Date were substituted for the date of this Agreement):

(a) The Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware.

(b) The Buyer has all requisite corporate or other entity power and authority to execute and deliver this Agreement and the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by the Buyer of this Agreement and the Transaction Documents to which it is a party, and the consummation of the Transaction, have been duly and validly authorized by all requisite corporate or other entity action on the part of the Buyer and no other corporate or other entity action on the part of the Buyer is necessary to authorize this Agreement and such Transaction Documents and to consummate the transactions contemplated hereby and thereby (subject, in the case of the obligation to consummate the Transaction, to the entry of the Sale Order). This Agreement and the Transaction Documents to which the Buyer is a party have been duly and validly executed and delivered by the Buyer and (assuming the due authorization, execution and delivery by all Parties hereto and thereto, other than the Buyer) constitute valid and binding obligations of the Buyer enforceable against the Buyer in accordance with their terms.

(c) Neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby, in accordance with the terms of this Agreement, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or any provision of its Governing Documents, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets are subject.

(d) The Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transaction for which the Seller could become liable or obligated.

(e) The Buyer shall as of the Closing have the requisite financial wherewithal to consummate the transaction contemplated by this Agreement, and the Closing of this Agreement is not contingent on the Buyer obtaining financing or other financial conditions.

(f) The Buyer has completed its due diligence review of the Condominiums and the Closing of this Agreement is not contingent on the Buyer completing any additional due diligence review.

## 9. Representations and Warranties by the Seller.

The Seller represents and warrants to the Buyer that the statements contained in this Section shall be correct and complete as of the Closing Date. The representations and warranties set forth in this Section shall not survive the Closing, and shall not remain in full force and effect for any reason after the Closing Date. Based on this Section, (i) no officer, director, employee, agent, or

DocuSign Envelope ID: A3CBA2A4-F584-45A4-A4E9-449849B3F21C

representative of the Seller shall have any liability for any breach of any representation, warranty, or covenant or relating to the completeness or accuracy of any representation, warranty, covenant at any time, and (ii) the Seller shall not have any liability for any breach of any representation, warranty or covenant, after the Closing and if Buyer discovers any such breach prior to the Closing its sole remedy will be to terminate this Agreement and refuse to Close.

(a)  The Seller is duly organized under the laws of the State of Missouri and is validly existing and in good standing under such laws. The Seller is duly authorized to conduct business and is in good standing under the laws of the jurisdiction where such qualification is required. The Seller is informed and believes that it is not in default under or in violation of any provision of its Governing Documents.

(b) Subject to Bankruptcy Court authorization, the Seller has all requisite corporate or other entity power and authority to execute and deliver this Agreement and the Transaction Documents to which it is (or will become) a party and to perform its obligations hereunder and thereunder (subject to the entry of the Sale Order). The execution, delivery and performance by the Seller of this Agreement and the Transaction Documents to which it is (or will become) a party and the consummation of the transaction contemplated hereby and thereby have been duly and validly authorized by all requisite corporate or other entity action on the part of the Seller and no other corporate or other entity action on the part of the Seller is necessary to authorize this Agreement and such Transaction Documents and to consummate the transactions contemplated hereby and thereby (subject to the entry of the Sale Order). This Agreement and the Transaction Documents to which the Seller is (or will become) party have been (or will be) duly and validly executed and delivered by the Seller and (assuming the due authorization, execution and delivery by all Parties hereto and thereto, other than the Seller) constitute (or will constitute) valid and binding obligations of the Seller enforceable against the Seller in accordance with their terms (subject to the entry of the Sale Order).

(c)  Subject to entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the transaction contemplated hereby in accordance with terms of this Agreement, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Seller is subject or any provision of the Governing Documents of the Seller, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any lien upon any of its assets).

(d)  The Seller shall have no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transaction contemplated by this Agreement, except in the event that the Buyer's Premium is deemed to be an asset of the estate, the Seller shall be responsible for payment of Fisher the Buyer's Premium according to the terms of the Order authorizing their employment.

DocuSign Envelope ID: A3CBA2A4-E584-45A4-A4E9-4469A9B3F21C

(e)  The Seller shall convey to the Buyer good and marketable title to the Condominiums through the terms of the Sale Order, which shall provide that such sale and conveyance is free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f).

(f)  All material Tax Returns required to be filed by or on behalf of the Seller with respect to the Condominiums (i) have been timely filed (taking into account extensions), (ii) were correct and complete, and (iii) all Taxes shown as due on such Tax Returns have been paid.

## 10. Pre-Closing Covenants.

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing:

Each of the Parties will use commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the transaction contemplated by this Agreement, including executing such additional transaction documents as are necessary, in the Buyer's reasonable discretion, to consummate the transaction contemplated hereby.

The Seller will use commercially reasonable efforts to obtain the Sale Order from the Bankruptcy Court and any authorizations, consents, and approvals of governments and governmental agencies in connection with the matters required to consummate the transaction contemplated herein.

The Seller will maintain and preserve the Condominiums in substantially the same condition as existed on the date of this Agreement, ordinary wear and tear excepted, and will not demolish or remove any of the existing improvements from, or erect new improvements on, the Condominiums, or any portion thereof, without the prior written consent of the Buyer.

## 11. Conditions to Obligation to Close.

The Buyer's obligation to consummate the transaction to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a) the representations and warranties set forth above shall be true and correct in all material respects at and as of the Closing Date;

(b) the Seller has performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c) the Sale Order has become a final Order;

(d) the Seller shall have received all authorizations, consents, and approvals of governments and governmental agencies;

(e) the Buyer shall have obtained title insurance policies from the Title Company (which may be in the form of a mark-up of a pro forma of the Title Commitment) in accordance with the Title Commitments, insuring the fee interest in the Condominiums as of the Closing Date; and

The Buyer may waive in writing any condition specified in this Section.

The obligation of the Seller to consummate the transaction to be performed by the Seller in connection with the Closing is subject to satisfaction of the following conditions:

(a) the representations and warranties set forth above shall be true and correct in all material respects at and as of the Closing Date;

(b) the Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c) the Sale Order has become a final Order;

(d) the Seller shall have received any authorizations, consents, and approvals of government agencies necessary for the transaction contemplated by this Agreement; and

(e) all actions to be taken by the Buyer in connection with consummation of the transaction contemplated hereby and all documents required to effectuate the transaction are in a reasonably satisfactory form and substance to the Seller.

The Seller may waive in writing any condition specified.

## 12. Termination.

The Parties may terminate this Agreement as provided below:

(a) The Seller may terminate this Agreement by giving written notice to the Buyer at any time prior to the Closing if (i) the Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, the Seller has notified the Buyer of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach, (ii) the Closing shall not have occurred on or before 30 days after entry of the Sale Order due to failure of any condition precedent (unless the failure results primarily from any Seller breaching any representation, warranty, or covenant contained in this Agreement); or (iii) the Bankruptcy Court enters an Order denying the relief requested in the Sale Motion.

(b) IN THE EVENT THE SELLER TERMINATES THIS AGREEMENT PURSUANT TO 12(a)(i) OR 12(a)(ii) ABOVE, THE STALKING HORSE DEPOSIT SHALL BE DELIVERED TO THE SELLER BY THE ESCROW AGENT UPON WRITTEN DEMAND, AND THE SELLER SHALL RETAIN THE STALKING HORSE DEPOSIT AS THE SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION, AND THE STALKING HORSE DEPOSIT SHALL BE RETAINED BY THE SELLER AS LIQUIDATED DAMAGES WITH RESPECT TO SUCH DEFAULT. THE SELLER, ON THE ONE HAND, AND THE BUYER,

DocuSign Envelope ID: A3CBA2AA-F584-45A4-A4E9-449849B3F21C

ON THE OTHER HAND, AGREE THAT IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO FIX ACTUAL DAMAGES TO THE SELLER AS A RESULT OF A DEFAULT BY THE BUYER AND THAT THEY HAVE AGREED THE SUM OF THE STALKING HORSE DEPOSIT IS A FAIR AND REASONABLE AMOUNT TO BE RETAINED BY THE SELLER AS AGREED AND LIQUIDATED DAMAGES IN LIGHT OF THE SELLER'S REMOVAL OF THE CONDOMINIUMS FROM THE MARKET AND THE COSTS INCURRED BY THE SELLER AND THAT RETENTION OF THE STALKING HORSE DEPOSIT BY THE SELLER SHALL NOT CONSTITUTE A PENALTY OR FORFEITURE.

_KEM_ Buyer's Initials _____ Seller's Initials

## 13. Miscellaneous.

This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

This Agreement (including all documents referred to herein and all Exhibits and Schedules hereto) constitutes the entire agreement among the Parties and supersedes all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of his, her, or its rights, interests, or obligations hereunder without the prior written approval of the Buyer and the Seller.

This Agreement may be executed in one or more counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

All notices, requests, demands, Claims, and other communications hereunder shall be in writing. Any notice, request, demand, Claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one business day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) 4 business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to the Buyer:          General Management VII, LLC
                          c/o R. Emmett McNulty
                          2 Shelton Road
                          Swampscott, MA 01907
                          Telephone: (978) 414-5720
                          Email: emcnulty@generalmanagementgroup.com

Copy to:                  John F. Mahoney
                          7330 College Drive, Suite 107
                          Palos Heights, Illinois 60463
                          Telephone: (708) 341-7261
                          Email: jmahoney@JFMLAWOffice.com

If to the Seller:         Yacht Club Vacation Owners Association, Inc.
                          C/o Herbert H. Patrick, Jr., President
                          One Vance Gap Road
                          Asheville, North Carolina 28805
                          Email: bpatrick@zhcompany.com

Copy to:                  Daniel D. Doyle, Esquire
                          LASHLY & BAER, P.C.
                          714 Locust Street
                          St. Louis, MO 63101
                          Telephone: 314-621-2939
                          Email: ddoyle@lashlybaer.com


This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Missouri applicable to a contract executed and performed exclusively in the State of Missouri.

No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

The Buyer and the Seller shall bear their own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

The Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof.

The Bankruptcy Court shall have exclusive jurisdiction over any dispute between the Buyer and the Seller relating to this Agreement and the transaction contemplated herein

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of _____ _____, 2021.

YACHT CLUB VACATION
OWNERS ASSOCIATION, INC.,
Chapter 11 Debtor-in-Possession

By: _____
Name: Herbert H. Patrick, Jr.
Its: President

GENERAL MANAGEMENT VII, LLC,
A DELAWARE LIMITED LIABILITY
COMPANY

BY: GENERAL MANAGEMENT GROUP

By: R Emmett McNulty _____
Name: R Emmett McNulty
Its: Manager

11

DocuSign Envelope ID: A3CBA2AA-F58A-45A4-A4E9-449949B3E21C

## Schedule 2-A

## Legal Description of Condominiums

LEGAL DESCRIPTION- PARCEL FOR BUILDING 1:

A TRACT OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼; THENCE N 01°50'42" E, A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E, A DISTANCE OF 500.48 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-23; ALONG THE GOVERNMENT FEE TAKING LINE FOR TABLE ROCK LAKE AS FOLLOWS: THENCE S 43°16'36" E, A DISTANCE OF 443.55 FEET TO THE NEW POINT OF BEGINNING; THENCE CONTINUING S 43°16'36" E, A DISTANCE OF 15.29 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-24; THENCE S 62°20'33" E, A DISTANCE OF 85.96 FEET; THENCE S 27°39'27" W, LEAVING THE GOVERNMENT FEE TAKING LINE, A DISTANCE OF 52.00 FEET; THENCE N 62°20'33" W, A DISTANCE OF 120.11 FEET; THENCE N 46°43'24" E, A DISTANCE OF 60.30 FEET TO THE NEW POINT OF BEGINNING; CONTAINING 5819 SQUARE FEET OF LAND, MORE OR LESS, TOGETHER WITH AND SUBJECT TO AN INGRESS AND EGRESS EASEMENT DESCRIBED BELOW AND SUBJECT TO ALL OTHER EASEMENTS AND
RESTRICTIONS OF RECORD.

INGRESS AND EGRESS EASEMENT:

AN INGRESS AND EGRESS EASEMENT LYING OVER AND ACROSS A PARCEL OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE 1/4 ; THENCE N 01°50'42" E, A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01 °59'49" E, A DISTANCE OF 140.99 FEET TO THE SOUTH TERMINUS OF AN
EXISTING COUNTY ROAD FOR A NEW POINT OF BEGINNING; THENCE CONTINUING N 01°59'49" E, A DISTANCE OF 40.00 FEET TO THE NORTH TERMINUS OF THE EXISTING COUNTY ROAD; THENCE N 79°52'48 "E, A DISTANCE OF 43.37 FEET; THENCE S 85°58'41 "E, A DISTANCE OF 39.12 FEET; THENCE S 89°10'44" E, A DISTANCE OF 32.00 FEET; THENCE N 87°05'47" E, A DISTANCE OF 68.10 FEET; THENCE N 46°43'24" E, A DISTANCE OF 18.51 FEET; THENCE S 43°16'36" E, A DISTANCE OF 64.38 FEET; THENCE S 56°07'49" E, A DISTANCE OF 36.40 FEET; THENCE N 46°43'24" E, A DISTANCE OF 2.38 FEET; THENCE S 62°20'33" E, A
DISTANCE OF 67.33 FEET; THENCE N 77°43'50" W, A DISTANCE OF 95.81 FEET; THENCE N 66°12'54" W, A DISTANCE OF 77.15 FEET; THENCE S, 19°49'04" W, A DISTANCE OF 79.08 FEET; THENCE N 40°54'33" W, A DISTANCE OF 55.03 FEET; THENCE N 63°49'16" W. A DISTANCE OF 61.65 FEET; THENCE S, 79°06'09" W, A DISTANCE OF 50.85 FEET TO THE NEW POINT OF BEGINNING; CONTAINING 0.32 ACRES OF LAND, MORE OR LESS.

SUBJECT TO THE NOTES AND OTHER INDICATED RESTRICTIONS, IF ANY, ON SAID PLAT OR PLATS AND SUBJECT TO THE CONDITIONS, COVENANTS, RESERVATIONS, EASEMENTS, CHARGES AND LIENS REFLECTED IN THE ORIGINAL DECLARATION AND SUPPLEMENTAL DECLARATIONS FILED IN CONNECTION THEREWITH IN THE OFFICE OF THE CLERK OF COURT IN AND FOR STONE COUNTY, MISSOURI.

LEGAL DESCRIPTION-PARCEL FOR BUILDING 2:

A TRACT OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST OF THE FIFTH PRINCIPAL MERIDIAN, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼ SAID SECTION 5, THENCE N 01°50'42" E A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E A DISTANCE OF 500.48 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-23; THENCE S 43°16'36" E ALONG THE GOVERNMENT FEE TAKE LINE FOR TABLE ROCK LAKE A DISTANCE OF

DocuSign Envelope ID: A3CBA2AA-E58d-45A4-A4F9-446049B3E21C

458.84 FEET TO CORPS OF ENGINEERS MONUMENT 206- 1-24; THENCE S 62°20'33" E A DISTANCE OF 85.96 FEET TO THE POINT OF BEGINNING; THENCE S62°20'33"E A DISTANCE OF 96.26 FEET; THENCE LEAVING THE GOVERNMENT FEE TAKE LINES 27°39'27" W A DISTANCE OF 52.00 FEET; THENCE N 62°20'33" W A DISTANCE OF 96.26 FEET; THENCE N 27°39'27" E A DISTANCE OF 52.00 FEET TO THE POINT OF BEGINNING, CONTAINING 5,006 SQUARE FEET OR 0. 115 ACRES MORE OR LESS, TOGETHER WITH AN INGRESS AND EGRESS EASEMENT DESCRIBED BELOW AND SUBJECT TO ALL OTHER EASEMENTS AND RESTRICTIONS OF RECORD.

INGRESS AND EGRESS EASEMENT DESCRIPTION:

AN INGRESS AND EGRESS EASEMENT LYING OVER AND ACROSS A PARCEL OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST OF THE FIFTH PRINCIPAL MERIDIAN, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼ SAID SECTION 5, THENCE N 01°50'42" E A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E A DISTANCE OF 140.99 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE SOUTH TERMINUS OF AN EXISTING COUNTY ROAD; THENCE N 01°59'49" E A DISTANCE OF 40.00 FEET TO THE NORTH TERMINUS OF THE EXISTING COUNTY ROAD; THENCE N 79°52'48" E A DISTANCE OF 43.37 FEET; THENCE S 85°58'41" E A DISTANCE OF 39.12 FEET; THENCE S 89°10'44" E A DISTANCE OF 32.00 FEET; THENCE N 87°05'47" E A DISTANCE OF 68.10 FEET; THENCE N 46°43'24" E A DISTANCE OF 18.51 FEET;
THENCE S 43°16'36" E A DISTANCE OF 64.38 FEET; THENCE S 56°07'49" E A DISTANCE OF 36.40 FEET; THENCE N 46°43'24" E A DISTANCE OF 2.38 FEET; THENCE S 62°20'33" E A DISTANCE OF 120.11 FEET; THENCE S 62°20'33" E A DISTANCE OF 96.26 FEET; THENCE S 27°39'27" W A DISTANCE OF 20.00 FEET; THENCE N 62°20'33" W A DISTANCE OF 221.71 FEET; THENCE N 77°43'50" W A DISTANCE OF 20.44 FEET; THENCE N 66°12'54" W A DISTANCE OF 77.15 FEET; THENCE N 19°49'04" W A DISTANCE OF 79.08 FEET; THENCE N 40°54'33" W A DISTANCE OF 55.03 FEET; THENCE N 63°49'16" W A DISTANCE OF 61.65 FEET; THENCE S 79°06'09" W A DISTANCE OF 50.85 FEET TO THE POINT OF BEGINNING (SOUTH TERMINUS OF THE EXISTING COUNTY ROAD), CONTAINING 0.405 ACRES MORE OR LESS.

**611 Rock Lane Building 1**

| | 135/136 | 137/138 | 139/140 | 141/142 | 143/144 | 145/146 |
|---|---|---|---|---|---|---|
| **Main Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Oven | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and six chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| | | | | | | |
| **Main Living Room** | | | | | | |
| Sofa and loveseat | x | x | x | x | x | x |
| Large cushioned chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | | x | x |
| Coffee table | x | x | x | x | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Wall art/wall mirror | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Vacuum | x | | | x | x | |
| Telephone | x | x | x | x | | x |
| | | | | | | |
| **Main Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | NOTE | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Alarm clock | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | | x | x | x | x | x |
| | | | | | | |
| **Main Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| | | | | | | |
| **Misc** | | | | | | |
| Stackable washer/dryer | x | x | x | x | x | x |
| Central HVAC | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |

**611 Rock Lane Building 1**

| | 135/136 | 137/138 | 139/140 | 141/142 | 143/144 | 145/146 |
|---|---|---|---|---|---|---|
| **Lock off Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Stove top | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and four chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| | | | | | | |
| **Lock off Living Room** | | | | | | |
| Sleeper sofa | x | x | x | x | x | x |
| Coffee table | ███ | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Reading lamp | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Stackable washer dryer in closet | x | x | x | x | x | x |
| | | | | | | |
| **Lock off Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | ███ | x | x | x |
| Two side tables and lamps | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | ███ | x | x | x | x | x |
| | | | | | | |
| **Lock off Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |
| | | | | | | |
| **Patio** | | | | | | |
| Table and four chairs | x | x | x | x | x | x |

| | 611 Rock Lane Building 2 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 147/148 | 149/150 | 151/152 | 154/153 | 155/156 | 157/158 |
| **Main Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Oven | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and six chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| **Main Living Room** | | | | | | |
| Sofa and loveseat | x | x | x | x | x | x |
| Large cushioned chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Coffee table | x | x | x | x | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Wall art/wall mirror | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Vacuum | x | 🟥 | 🟥 | x | 🟥 | x |
| Telephone | x | x | x | x | x | x |
| **Main Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Alarm clock | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | 🟥 | x | x | x | 🟥 | x |
| **Main Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| **Misc** | | | | | | |
| Stackable washer/dryer | x | x | x | x | x | x |
| Central HVAC | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |

| | 611 Rock Lane Building 2 | | | | | |
|---|---|---|---|---|---|---|
| | 147/148 | 149/150 | 151/152 | 154/153 | 155/156 | 157/158 |
| **Lock off Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Stove top | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and four chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| **Lock off Living Room** | | | | | | |
| Sleeper sofa | x | x | x | x | x | x |
| Coffee table | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Reading lamp | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Stackable washer dryer in closet | x | x | x | x | x | x |
| **Lock off Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Two side tables and lamps | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | x | ■ | x | x | x | x |
| **Lock off Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |
| **Patio** | | | | | | |
| Table and four chairs | x | x | x | x | x | x |

NOTE
Unit 141/142 - No TV in Main Living Room.  Two TVs in Lock off living room.  No TV in Lock off bedroom.

# Instructions for Bidder Qualification

**Real Estate Online Auction**
**By Order of the United States Bankruptcy Court**
**Western District of Missouri | Southwestern Division**
**RE: Yacht Club Vacation Owners Association, Inc., Case #20-41555-11**
**Two (2) Six (6) Unit Vacation Condominium Properties within the "Rock Lane Resort and Marina"**
**611 Rock Lane, Branson, Missouri 65616**
**_____, 2021 beginning at 11:00 AM Central Time and concluding at 1:00 PM Central Time**

The following instructions are to help guide you in becoming a qualified bidder for the Online Auction. The following documents and Initial Escrow Deposit are due before _____, _____, 2021 **[2 business days prior to the Auction Date]** by 5:00 PM Central Time;

1.  Complete and sign the Bidder Pre-Registration Form.

2.  Complete and sign the Return of Initial Escrow Deposit Form.

3.  Complete and sign the Acknowledgement of Review of the Asset Purchase Agreement and the Order Approving Bid and Sale Procedures entered by the United States Bankruptcy Court Western District of Missouri, Southwestern Division.

4.  Wire into Lashly & Baer, P.C.'s Trust Account (the "Escrow Agent") via a Federal wire transfer in U.S. Funds (not an ACH Credit) a $100,000 Initial Escrow Deposit ("Initial Bid Deposit") no later than 5:00 PM Central Time _____ _____, 2021 **[2 business days prior to the Auction Date].** Contact Fisher Auction Company for wiring instructions via email info@fisherauction.com or call 954.942.0917, Ext. 4124.

5.  Email information to ddoyle@lashlybaer.com and info@fisherauction.com sufficient to demonstrate you have the financial means to purchase the property, such as a bank letter, recent financial statements, account statements, or tax return.

6.  You must submit your complete registration package no later than _____ _____, 2021 **[2 business days prior to the Auction Date]** at 5:00 PM Central Time **via email or facsimile** to the following;

> **Fisher Auction Company**
> **info@fisherauction.com**
> **Facsimile: 954.782.8143**
> **Phone: 954.942.0917, Ext. 4124**

7.  The Auction will begin at 11:00 AM Central Time on **[Auction Date]** and conclude at 1:00 PM Central Time on **[Auction Date]** on Fisher Auction Company's Online Bidder Application which can be accessed through the Fisher Auction Company website. Please note that each Bidder will need to click "accept" to agree to the Online Bidding Application terms prior to the start of the sale in order to become activated to bid.

8.  The highest and best bidder will execute the non-contingent approved Asset Purchase Agreement at their bid price immediately following the Auction.

A Sale Hearing ("Sale Hearing") is scheduled for _____ 2021 at _____ __M Central Time in the United States Bankruptcy Court Western District of Missouri Southwestern Division, for the United States Bankruptcy Court to approve the Sale of Real Property free and clear of all liens, claims and encumbrances to the Highest and Best Bidder. Within (24) hours from the highest and best bidder being approved by the Court, the successful bidder shall make an Additional Escrow Deposit totaling (10%) of the total contract price in U.S. Funds by wire transfer into Lashly & Baer P.C.'s Trust Account (the "Escrow Agent").

**EXHIBIT C**

## BIDDER PRE-REGISTRATION FORM
**Real Estate Online Auction**
**By Order of the United States Bankruptcy Court**
**Western District of Missouri | Southwestern Division**
**RE: Yacht Club Vacation Owners Association, Inc., Case #20-41555-11**
**Two (2) Six (6) Unit Vacation Condominium Properties within the "Rock Lane Resort and Marina"**
**611 Rock Lane, Branson, Missouri 65616**
**_____, 2021 beginning at 11:00 AM Central Time and concluding at 1:00 PM Central Time**

**(Please Type or Print Clearly)**

| | |
|---|---|
| **Name:** | |
| **Company Name (if applicable):** | |
| **Company Address:** | |
| **City, State & Zip:** | |
| **City, Country & Country Code (if outside the U.S.):** | |
| **Residential Address:** | |
| **City, State & Zip:** | |
| **City, Country & Country Code (if outside the U.S.):** | |
| **Valid State Issued Driver's License No. or Passport (Copy of License or Passport Required):** | |
| **Contact Phone:** | **Facsimile:** |
| **Email:** | |
| **Entity in which Bidder will take Title:** | |
| **Marital Status:** | |
| **Bidder's Signature:** | **Date:** |
| **How did you hear about Auction:** | |

2

# Return of Initial Escrow Deposit Form

**Real Estate Online Auction**
**By Order of the United States Bankruptcy Court**
**Western District of Missouri | Southwestern Division**
**RE: Yacht Club Vacation Owners Association, Inc., Case #20-41555-11**
**Two (2) Six (6) Unit Vacation Condominium Properties within the "Rock Lane Resort and Marina"**
**611 Rock Lane, Branson, Missouri 65616**
**_____, 2021 beginning at 11:00 AM Central Time and concluding at 1:00 PM Central Time**

In the event that you are not the Successful Bidder or Back-Up Bidder on the Property, please fill out this form to instruct Lashly & Baer, P.C. (the "Escrow Agent") as to how to return your Initial Escrow Deposit. **Please note, any return of escrowed funds will be returned to the same bank account where the funds had originated.**

The amount of the Initial Escrow Deposit held in Escrow is: **$100,000.**

I, _____, hereby authorize Lashly & Baer, P.C. (the "Escrow Agent"), to release my Initial Escrow Deposit back to me within five (5) business days via:

**PLEASE TYPE OR PRINT CLEARLY**
A wire transfer to the originating bank to the originator per the wiring instructions below:

### Bank Information

| | |
|---|---|
| **Bank Name:** | |
| **Address:** | |
| **City, St., Zip** | |
| **Phone:** | |
| **Swift Code (International Wires):** | |
| **ABA Number:** | |

### Account Information

| | |
|---|---|
| **Account Name:** | |
| **Account Number:** | |
| **Address:** | |
| **City, St., Zip** | |
| **Phone:** | |

| | |
|---|---|
| **Bidder Signature:** | **Date:** |

3

**ACKNOWLEDGEMENT OF REVIEW OF THE ASSET PURCHASE AGREEMENT AND THE ORDER APPROVING BID AND SALE PROCEDURES ENTERED BY THE UNITED STATES BANKRUPTCY COURT WESTERN DISTRICT OF MISSOURI, SOUTHWESTERN DIVISION**

**Real Estate Online Auction**
**By Order of the United States Bankruptcy Court**
**Western District of Missouri | Southwestern Division**
**RE: Yacht Club Vacation Owners Association, Inc., Case #20-41555-11**
**Two (2) Six (6) Unit Vacation Condominium Properties within the "Rock Lane Resort and Marina"**
**611 Rock Lane, Branson, Missouri 65616**
**_____, 2021 beginning at 11:00 AM Central Time and concluding at 1:00 PM Central Time**


I _____, hereby acknowledges that I have read and
        **(Name of Bidder)**

agree to be bound by the **Asset Purchase Agreement, The Order Approving Bid and Sale Procedures Entered by the United States Bankruptcy Court Western District of Missouri, Southwestern Division, as well as the Court's ruling at the Sale Approval Hearing that is scheduled for _____ at _____ ____M Central Time.**


Acknowledged:

| | | |
|---|---|---|
| | | |
| **Signature** | **Date** | **Time** |

4

# ASSET PURCHASE AGREEMENT

## 1. Parties.

The parties to this Asset Purchase Agreement (the "**Agreement**") are Yacht Club Vacation Owners Association, Inc., Chapter 11 Debtor and Debtor in Possession, (the "**Association**" or the "**Seller**"), and _____ (the "**Buyer**"). The Seller and the Buyer are each individually a "**Party**," and collectively the "**Parties**," to this Agreement.

## 2. Preliminary Statement.

On August 28, 2020, (the "**Petition Date**"), the Association filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), designated as Case No. 20-41555-11 in the United States Bankruptcy Court for the Western District of Missouri, Southwestern Division (the "**Bankruptcy Court**"). The Association is a not-for-profit corporation created in 2002 to manage, operate and maintain the Two (2) Six (6) Unit Vacation Timeshare Condominium Properties in the Rock Lane Resort at 611 Rock Lane, Branson, Missouri 65616, pursuant to the Supplemental Declaration of Covenants and Restrictions for Yacht Club Condominiums (the "**Timeshare Plan Declaration**") filed on or about March 27, 2002, and recorded in Deed Book 411 at pages 143-192, in Stone County with the Office of the Recorder of Deeds, as subsequently supplemented and amended. Subject to the Bankruptcy Court's approval, the Seller desires to sell and otherwise transfer to the Buyer, and the Buyer wishes to buy the Two (2) Six (6) Unit Vacation Condominium Properties in the Timeshare Plan, the legal descriptions for which are set forth on Schedule 2-Aof this Agreement (the "**Condominiums**"), including the Association's undivided deeded interests in the Condominiums and those of all other timeshare owners in the Condominiums, and all furnishings, fixtures, and equipment used to operate the Condominiums. Buyer shall not assume any liabilities of the Seller of any kind unless Buyer agrees otherwise in writing.

## 3. The Purchase Price

Buyer agrees to purchase the Condominiums and to pay to the Seller at the Closing by delivery of cash payable by wire transfer - _____ and 00/100 Dollars ($_____) (the "**Purchase Price**")  The Buyer has paid an initial deposit of One Hundred Thousand Dollars ($100,000.00) (the "**Bidder Deposit**") to the Seller's attorney, Lashly & Baer, P.C., as Escrow Agent.  Immediately following the Auction, the Buyer shall supplement the Bidder Deposit to equal ten percent (10%) of the Total Purchase Price (defined below) as an earnest money deposit (as supplemented, the "**Deposit**").  The supplemental payment to make the required ten percent (10%) Deposit shall be paid by Wire Transfer to the Seller's attorney, as Escrow Agent. In addition to the Purchase Price, the Buyer shall pay a "buyer's premium" equal to seven percent (7%) of the Purchase Price (the "**Buyer's Premium**"), to be paid with the Purchase Price at Closing.  The total of the Purchase Price and the Buyer's Premium shall constitute the "**Total Purchase Price**" to be paid by the Buyer.

**EXHIBIT C**

The balance of the Total Purchase Price, after crediting the Buyer Deposits, will be paid by wire transfer at the Closing.

**4. The Condominiums**.

Upon Bankruptcy Court approval of the sale, the Seller shall transfer, assign and convey a quit-claim deed to the Condominiums, which are identified as unit numbers: 135 A/B, 137 A/B, 139 A/B, 141 A/B, 143 A/B and 145 A/B of Building 1 and 147 A/B, 149 A/B, 151 A/B, 153 A/B, 155 A/B and 157 A/B of Building 2, and as legally described on Schedule 2-A.

**5. "As Is" Condition**

The Buyer specifically acknowledges and agrees that the Condominiums are being sold in an "AS IS" condition, with specific acknowledgement of the disrepair of stairwells, as of the Closing Date.

**6. Bankruptcy Proceedings**.

This Agreement is subject to approval of the Bankruptcy Court, and all applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court. This Agreement is effective only if it is the highest and best bid for the Condominiums after bidding and auction procedures to be approved by the Bankruptcy Court.

The sale under this Agreement arises under motions filed by the Seller for approval and authorization of a sale of the Condominiums.  The Seller filed a motion with the Bankruptcy Court (the "**Sale Motion**") seeking authority to consummate the transaction contemplated hereunder, as provided in an order (the "**Sale Order**") that (a) authorizes the sale of the Condominiums to the Buyer, if the successful bidder, free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. §§ 363(b), 363(f), and 363(h) with all liens, charges, claims and encumbrances to attach to the sale proceeds of the Condominiums, and (b) provides that (i) the Buyer has acted in "good faith" within the meaning of 11 U.S.C. § 363(m), (ii) the sale was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (iii) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to the sale of the Condominiums or this Agreement, or any breach hereof, and (iv) the terms of this Agreement and the transaction contemplated thereby may be specifically enforced against and binding upon the Parties, and not subject to rejection or avoidance by the Association. The Sale Order shall further provide that the Buyer is not a successor to the business of the Association; that the purchase price represents a fair market value of the Condominiums; that the Buyer shall have no liability for any obligations of the Association; and that the automatic 14- day stay under Rule 6004 of the Federal Rules of Bankruptcy Procedures shall not apply to the Sale Order.
The Seller also filed with the Sale Motion a companion motion (the "**Bidding Procedures Motion**") seeking to establish bidding procedures and certain bid protections (the "**Bidding Procedures**").  The Bankruptcy Court granted the Bidding Procedures Motion by its Order entered on _____ __, 2021 (the "**Bidding Procedures Order**").

As part of the sale process by which the Seller is duty-bound to attempt to obtain the highest and best value for the Condominiums, to the extent reasonably possible, the Seller marketed the Condominiums and solicited offers to purchase by and through an online auction (the "**Auction**") conducted by Fisher Auction Company ("**Fisher**"). Fisher marketed and promoted the Auction for a period of at least 60 days, at the end of which Fisher conducted the Auction.

Pursuant to the terms of their employment and the approved Bidding Procedures, Fisher will not be paid its fees by the Seller (other than marketing expenses as defined in the Seller's motion to employ them).  Instead, Fisher will be paid by the prevailing purchaser, from a "Buyer's Premium" added to the successful bid in the amount of seven percent (7%) (the "**Buyer's Premium**") of the successful bid, the successful bid amount plus the Buyer's Premium being the "**Total Purchase Price**" to be paid by the prevailing purchaser.

The Bid Procedures Order contains the following provisions:

(a) Any bid must be accompanied by (i) an additional earnest money payment to supplement the Bidder's Deposit, so as to provide the required purchaser Deposit of ten percent (10%) of the total of the Total Purchase Price offered by that bidder, provided by Wire Transfer, which amount shall be held in escrow in the trust account of the Seller's attorney, Lashly & Baer, P.C., acting as Escrow Agent for the Deposit, pending completion of the bidding process; and (ii) satisfactory proof of the bidder's financial qualifications;

(b) A party submitting a bid complying with these provisions and with any other requirements contained in the Bidding Procedures Order, including submission of the items listed in the Instructions for Bidder Qualification approved in the Bidding Procedures Order, shall be deemed a "**Qualified Bidder**."

(c) Only the Seller, any Qualified Bidder and their respective counsel and advisors may participate in the Auction;

(d) At the Auction, each subsequent bid must be in increments determined by Fisher, as Auctioneer, in its reasonable discretion;

(e) At the conclusion of the Auction the prevailing bidder shall submit this executed, Bankruptcy Court approved form of Asset Purchase Agreement with the successful auction price to the Seller for final approval by the Bankruptcy Court.

**7. Closing**.

The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place via the exchange of documents and the remittance of the Total Purchase Price to the Seller, which exchange and payment shall be deemed to occur at the offices of the Seller's attorney, in St. Louis, Missouri, and commencing at 9:00 a.m. local time on the fifteenth (15th) day following entry of the Sale Order, or on such earlier date at the Parties may agree if the Sale Order includes a finding and order provision that the good faith protections under Section 363(m) of the

Bankruptcy Code are applicable to the transaction and to the Buyer (the "**Closing Date**"), but in all events no later than thirty (30) days following the entry of the Sale Order.

At Closing, the Seller will deliver to the Buyer:

    (a) a quit-claim deed for the 12 condominium units, legally described on Schedule 2-A;

    (b) a bill of sale for all related furnishings, fixtures and equipment as described on Schedule 2-B of this Agreement; and

    (c) any document necessary for the title company to issue a title insurance policy.

At Closing, the Buyer shall deliver to the Seller the remaining cash portion of the Total Purchase Price described above.

Any taxes due on the Condominiums shall be prorated as of 12:01 a.m. on the Closing Date, with all such items attributable to period prior to 12:01 a.m. on the Closing Date being for the sole account of the Seller and all such items attributable to periods after 12:01 a.m. on the Closing Date being for the sole account of the Buyer. If the actual taxes are not available to determine the proration at the Closing Date, the proration shall occur based upon the most recent tax amounts available. The Buyer and the Seller shall furnish each other with such documents and other records as shall be reasonably requested in order to confirm all proration calculations. This provision shall survive the Closing.

**8. Representations and Warranties Concerning the Buyer.**

The Buyer represents and warrants to the Seller that the statements contained in this Section are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then, and as though the Closing Date were substituted for the date of this Agreement):

(a) The Buyer, if a business entity, is duly organized, validly existing, and in good standing.

(b) The Buyer, if a business entity, has all requisite corporate or other entity power and authority to execute and deliver this Agreement and the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by the Buyer of this Agreement and the Transaction Documents to which it is a party, and the consummation of the Transaction, have been duly and validly authorized by all requisite corporate or other entity action on the part of the Buyer and no other corporate or other entity action on the part of the Buyer is necessary to authorize this Agreement and such Transaction Documents and to consummate the transactions contemplated hereby and thereby (subject, in the case of the obligation to consummate the Transaction, to the entry of the Sale Order). This Agreement and the Transaction Documents to which the Buyer is a party have been duly and validly executed and delivered by the Buyer and (assuming the due authorization, execution and delivery by all Parties hereto and thereto, other than the Buyer) constitute valid and binding obligations of the Buyer enforceable against the Buyer in accordance with their terms.

(c) Neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby, in accordance with the terms of this Agreement, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or any provision of its Governing Documents, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets are subject.

(d) The Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transaction for which the Seller could become liable or obligated.

(e) The Buyer shall as of the Closing have the requisite financial wherewithal to consummate the transaction contemplated by this Agreement, and the Closing of this Agreement is not contingent on the Buyer obtaining financing or on other financial conditions.

(f) The Buyer has completed its due diligence review of the Condominiums and the Closing of this Agreement is not contingent on the Buyer completing any additional due diligence review.

## 9.  Representations and Warranties by the Seller.

The Seller represents and warrants to the Buyer that the statements contained in this Section shall be correct and complete as of the Closing Date. The representations and warranties set forth in this Section shall not survive the Closing, and shall not remain in full force and effect for any reason after the Closing Date. Based on this Section, (i) no officer, director, employee, agent, or representative of the Seller shall have any liability for any breach of any representation, warranty, or covenant or relating to the completeness or accuracy of any representation, warranty, covenant at any time, and (ii) the Seller shall not have any liability for any breach of any representation, warranty or covenant, after the Closing and if Buyer discovers any such breach prior to the Closing its sole remedy will be to terminate this Agreement and refuse to Close.

(a)  The Seller is duly organized under the laws of the State of Missouri and is validly existing and in good standing under such laws. The Seller is duly authorized to conduct business and is in good standing under the laws of the jurisdiction where such qualification is required. The Seller is informed and believes that it is not in default under or in violation of any provision of its Governing Documents.

(b) Subject to Bankruptcy Court authorization, the Seller has all requisite corporate or other entity power and authority to execute and deliver this Agreement and the Transaction Documents to which it is (or will become) a party and to perform its obligations hereunder and thereunder (subject to the entry of the Sale Order). The execution, delivery and performance by the Seller of this Agreement and the Transaction Documents to which it is (or will become) a party and the consummation of the transaction contemplated hereby and thereby have been duly and validly authorized by all requisite corporate or other entity action on the part of the Seller and no other

corporate or other entity action on the part of the Seller is necessary to authorize this Agreement and such Transaction Documents and to consummate the transactions contemplated hereby and thereby (subject to the entry of the Sale Order). This Agreement and the Transaction Documents to which the Seller is (or will become) party have been (or will be) duly and validly executed and delivered by the Seller and (assuming the due authorization, execution and delivery by all Parties hereto and thereto, other than the Seller) constitute (or will constitute) valid and binding obligations of the Seller enforceable against the Seller in accordance with their terms (subject to the entry of the Sale Order).

(c)  Subject to entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the transaction contemplated hereby in accordance with terms of this Agreement, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Seller is subject or any provision of the Governing Documents of the Seller, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any lien upon any of its assets).

(d)  The Seller shall have no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transaction contemplated by this Agreement, except in the event that the Buyer's Premium is deemed to be an asset of the estate, the Seller shall be responsible for payment of Fisher the Buyer's Premium according to the terms of the Order authorizing their employment.

(e)  The Seller shall convey to the Buyer good and marketable title to the Condominiums through the terms of the Sale Order, which shall provide that such sale and conveyance is free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f).

(f)  All material Tax Returns required to be filed by or on behalf of the Seller with respect to the Condominiums (i) have been timely filed (taking into account extensions), (ii) were correct and complete, and (iii) all Taxes shown as due on such Tax Returns have been paid.

**10. Pre-Closing Covenants**.

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing:

Each of the Parties will use commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the transaction contemplated by this Agreement, including executing such additional transaction documents as are necessary, in the Buyer's reasonable discretion, to consummate the transaction contemplated hereby.

The Seller will use commercially reasonable efforts to obtain the Sale Order from the Bankruptcy Court and any authorizations, consents, and approvals of governments and

governmental agencies in connection with the matters required to consummate the transaction contemplated herein.

The Seller will maintain and preserve the Condominiums in substantially the same condition as existed on the date of this Agreement, ordinary wear and tear excepted, and will not demolish or remove any of the existing improvements from, or erect new improvements on, the Condominiums, or any portion thereof, without the prior written consent of the Buyer.

**11. Conditions to Obligation to Close**.

The Buyer's obligation to consummate the transaction to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a) the representations and warranties set forth above shall be true and correct in all material respects at and as of the Closing Date;

(b) the Seller has performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c) the Sale Order has become a final Order;

(d) the Seller shall have received all authorizations, consents, and approvals of governments and governmental agencies;

(e) the Buyer shall have obtained title insurance policies from the Title Company (which may be in the form of a mark-up of a pro forma of the Title Commitment) in accordance with the Title Commitments, insuring the fee interest in the Condominiums as of the Closing Date; and

The Buyer may waive in writing any condition specified in this Section.

The obligation of the Seller to consummate the transaction to be performed by the Seller in connection with the Closing is subject to satisfaction of the following conditions:

(a) the representations and warranties set forth above shall be true and correct in all material respects at and as of the Closing Date;

(b) the Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c) the Sale Order has become a final Order;

(d) the Seller shall have received any authorizations, consents, and approvals of government agencies necessary for the transaction contemplated by this Agreement; and

(e) all actions to be taken by the Buyer in connection with consummation of the transaction contemplated hereby and all documents required to effectuate the transaction are in a reasonably satisfactory form and substance to the Seller.

The Seller may waive in writing any condition specified.

## 12. Termination.

The Parties may terminate this Agreement as provided below:

(a) The Seller may terminate this Agreement by giving written notice to the Buyer at any time prior to the Closing if (i) the Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, the Seller has notified the Buyer of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach, (ii) the Closing shall not have occurred on or before 30 days after entry of the Sale Order due to failure of any condition precedent (unless the failure results primarily from any Seller breaching any representation, warranty, or covenant contained in this Agreement); or (iii) the Bankruptcy Court enters an Order denying the relief requested in the Sale Motion.

(b) IN THE EVENT THE SELLER TERMINATES THIS AGREEMENT PURSUANT TO 12(a)(i) OR 12(a)(ii) ABOVE, THE BUYER'S DEPOSIT SHALL BE DELIVERED TO THE SELLER BY THE ESCROW AGENT UPON WRITTEN DEMAND, AND THE SELLER SHALL RETAIN THE DEPOSIT AS THE SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION, AND THE DEPOSIT SHALL BE RETAINED BY THE SELLER AS LIQUIDATED DAMAGES WITH RESPECT TO SUCH DEFAULT. THE SELLER, ON THE ONE HAND, AND THE BUYER, ON THE OTHER HAND, AGREE THAT IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO FIX ACTUAL DAMAGES TO THE SELLER AS A RESULT OF A DEFAULT BY THE BUYER AND THAT THEY HAVE AGREED THE SUM OF THE DEPOSIT IS A FAIR AND REASONABLE AMOUNT TO BE RETAINED BY THE SELLER AS AGREED AND LIQUIDATED DAMAGES IN LIGHT OF THE SELLER'S REMOVAL OF THE CONDOMINIUMS FROM THE MARKET AND THE COSTS INCURRED BY THE SELLER, AND THAT RETENTION OF THE DEPOSIT BY THE SELLER SHALL NOT CONSTITUTE A PENALTY OR FORFEITURE.

_____Buyer's Initials        _____Seller's Initials

## 13. Miscellaneous.

This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

This Agreement (including all documents referred to herein and all Exhibits and Schedules hereto) constitutes the entire agreement among the Parties and supersedes all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of his, her, or its rights, interests, or obligations hereunder without the prior written approval of the Buyer and the Seller.

This Agreement may be executed in one or more counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

All notices, requests, demands, Claims, and other communications hereunder shall be in writing. Any notice, request, demand, Claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one business day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) 4 business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to the Buyer:        _____
                        _____
                        Telephone:(   ) _____
                        Email: _____

Copy to:                _____
                        _____
                        _____
                        Telephone: (   ) _____
                        Email: _____

If to the Seller:       Yacht Club Vacation Owners Association, Inc.
                        C/o Herbert H. Patrick, Jr., President
                        One Vance Gap Road
                        Asheville, North Carolina 28805
                        Email: bpatrick@zhcompany.com

Copy to:                Daniel D. Doyle, Esquire
                        LASHLY & BAER, P.C.
                        714 Locust Street
                        St. Louis, MO 63101
                        Telephone: 314-621-2939

Email: ddoyle@lashlybaer.com

This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Missouri applicable to a contract executed and performed exclusively in the State of Missouri.

No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

The Buyer and the Seller shall bear their own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

The Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof.

The Bankruptcy Court shall have exclusive jurisdiction over any dispute between the Buyer and the Seller relating to this Agreement and the transaction contemplated herein

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of
_____, 2021.


YACHT CLUB VACATION
OWNERS ASSOCIATION, INC.,
Chapter 11 Debtor-in-Possession

By: _____
Name: Herbert H. Patrick, Jr.
Its: President


BUYER: _____


By: _____
Name: _____
Its:      _____

11

## Schedule 2-A

## Legal Description of Condominiums

LEGAL DESCRIPTION- PARCEL FOR BUILDING 1:

A TRACT OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼; THENCE N 01°50'42" E, A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E, A DISTANCE OF 500.48 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-23; ALONG THE GOVERNMENT FEE TAKING LINE FOR TABLE ROCK LAKE AS FOLLOWS: THENCE S 43°16'36" E, A DISTANCE OF 443.55 FEET TO THE NEW POINT OF BEGINNING; THENCE CONTINUING S 43°16'36" E, A DISTANCE OF 15.29 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-24; THENCE S 62°20'33" E, A DISTANCE OF 85.96 FEET; THENCE S 27°39'27" W, LEAVING THE GOVERNMENT FEE TAKING LINE, A DISTANCE OF 52.00 FEET; THENCE N 62°20'33" W, A DISTANCE OF 120.11 FEET; THENCE N 46°43'24" E, A DISTANCE OF 60.30 FEET TO THE NEW POINT OF BEGINNING; CONTAINING 5819 SQUARE FEET OF LAND, MORE OR LESS, TOGETHER WITH AND SUBJECT TO AN INGRESS AND EGRESS EASEMENT DESCRIBED BELOW AND SUBJECT TO ALL OTHER EASEMENTS AND
RESTRICTIONS OF RECORD.

INGRESS AND EGRESS EASEMENT:

AN INGRESS AND EGRESS EASEMENT LYING OVER AND ACROSS A PARCEL OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE 1/4 ; THENCE N 01°50'42" E, A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01 °59'49" E, A DISTANCE OF 140.99 FEET TO THE SOUTH TERMINUS OF AN
EXISTING COUNTY ROAD FOR A NEW POINT OF BEGINNING; THENCE CONTINUING N 01°59'49" E, A DISTANCE OF 40.00 FEET TO THE NORTH TERMINUS OF THE EXISTING COUNTY ROAD; THENCE N 79°52'48 "E, A DISTANCE OF 43.37 FEET; THENCE S 85°58'41 "E, A DISTANCE OF 39.12 FEET; THENCE S 89°10'44" E, A DISTANCE OF 32.00 FEET; THENCE N 87°05'47" E, A DISTANCE OF 68.10 FEET; THENCE N 46°43'24" E, A DISTANCE OF 18.51 FEET; THENCE S 43°16'36" E, A DISTANCE OF 64.38 FEET; THENCE S 56°07'49" E, A DISTANCE OF 36.40 FEET; THENCE N 46°43'24" E, A DISTANCE OF 2.38 FEET; THENCE S 62°20'33" E, A
DISTANCE OF 67.33 FEET; THENCE N 77°43'50" W, A DISTANCE OF 95.81 FEET; THENCE N 66°12'54" W, A DISTANCE OF 77.15 FEET; THENCE S, 19°49'04" W, A DISTANCE OF 79.08 FEET; THENCE N 40°54'33" W, A DISTANCE OF 55.03 FEET; THENCE N 63°49'16" W. A DISTANCE OF 61.65 FEET; THENCE S, 79°06'09" W, A DISTANCE OF 50.85 FEET TO THE NEW POINT OF BEGINNING; CONTAINING 0.32 ACRES OF LAND, MORE OR LESS.

SUBJECT TO THE NOTES AND OTHER INDICATED RESTRICTIONS, IF ANY, ON SAID PLAT OR PLATS AND SUBJECT TO THE CONDITIONS, COVENANTS, RESERVATIONS, EASEMENTS, CHARGES AND LIENS REFLECTED IN THE ORIGINAL DECLARATION AND SUPPLEMENTAL DECLARATIONS FILED IN CONNECTION THEREWITH IN THE OFFICE OF THE CLERK OF COURT IN AND FOR STONE COUNTY, MISSOURI.

LEGAL DESCRIPTION-PARCEL FOR BUILDING 2:

A TRACT OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST OF THE FIFTH PRINCIPAL MERIDIAN, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼ SAID SECTION 5, THENCE N 01°50'42" E A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E A DISTANCE OF 500.48 FEET TO CORPS OF ENGINEERS MONUMENT 206-1-23; THENCE S 43°16'36" E ALONG THE GOVERNMENT FEE TAKE LINE FOR TABLE ROCK LAKE A DISTANCE OF

458.84 FEET TO CORPS OF ENGINEERS MONUMENT 206- 1-24; THENCE S 62°20'33" E A DISTANCE OF 85.96 FEET TO THE POINT OF BEGINNING; THENCE S62°20'33"E A DISTANCE OF 96.26 FEET; THENCE LEAVING THE GOVERNMENT FEE TAKE LINES 27°39'27" W A DISTANCE OF 52.00 FEET; THENCE N 62°20'33" W A DISTANCE OF 96.26 FEET; THENCE N 27°39'27" E A DISTANCE OF 52.00 FEET TO THE POINT OF BEGINNING, CONTAINING 5,006 SQUARE FEET OR 0. 115 ACRES MORE OR LESS, TOGETHER WITH AN INGRESS AND EGRESS EASEMENT DESCRIBED BELOW AND SUBJECT TO ALL OTHER EASEMENTS AND RESTRICTIONS OF RECORD.

INGRESS AND EGRESS EASEMENT DESCRIPTION:

AN INGRESS AND EGRESS EASEMENT LYING OVER AND ACROSS A PARCEL OF LAND SITUATED IN THE SW ¼ OF THE NE ¼ OF SECTION 5, TOWNSHIP 22 NORTH, RANGE 22 WEST OF THE FIFTH PRINCIPAL MERIDIAN, STONE COUNTY, MISSOURI, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF THE SW ¼ OF THE NE ¼ SAID SECTION 5, THENCE N 01°50'42" E A DISTANCE OF 166.54 FEET TO AN EXISTING 5/8" IRON PIN SET BY R.L.S. 1994; THENCE N 01°59'49" E A DISTANCE OF 140.99 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE SOUTH TERMINUS OF AN EXISTING COUNTY ROAD; THENCE N 01°59'49" E A DISTANCE OF 40.00 FEET TO THE NORTH TERMINUS OF THE EXISTING COUNTY ROAD; THENCE N 79°52'48" E A DISTANCE OF 43.37 FEET; THENCE S 85°58'41" E A DISTANCE OF 39.12 FEET; THENCE S 89°10'44" E A DISTANCE OF 32.00 FEET; THENCE N 87°05'47" E A DISTANCE OF 68.10 FEET; THENCE N 46°43'24" E A DISTANCE OF 18.51 FEET;
THENCE S 43°16'36" E A DISTANCE OF 64.38 FEET; THENCE S 56°07'49" E A DISTANCE OF 36.40 FEET; THENCE N 46°43'24" E A DISTANCE OF 2.38 FEET; THENCE S 62°20'33" E A DISTANCE OF 120.11 FEET; THENCE S 62°20'33" E A DISTANCE OF 96.26 FEET; THENCE S 27°39'27" W A DISTANCE OF 20.00 FEET; THENCE N 62°20'33" W A DISTANCE OF 221.71 FEET; THENCE N 77°43'50" W A DISTANCE OF 20.44 FEET; THENCE N 66°12'54" W A DISTANCE OF 77.15 FEET; THENCE S 19°49'04" W A DISTANCE OF 79.08 FEET; THENCE N 40°54'33" W A DISTANCE OF 55.03 FEET; THENCE N 63°49'16" W A DISTANCE OF 61.65 FEET; THENCE S 79°06'09" W A DISTANCE OF 50.85 FEET TO THE POINT OF BEGINNING (SOUTH TERMINUS OF THE EXISTING COUNTY ROAD), CONTAINING 0.405 ACRES MORE OR LESS.

**611 Rock Lane Building 1**

| | 135/136 | 137/138 | 139/140 | 141/142 | 143/144 | 145/146 |
|---|---|---|---|---|---|---|
| **Main Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Oven | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and six chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| | | | | | | |
| **Main Living Room** | | | | | | |
| Sofa and loveseat | x | x | x | x | x | x |
| Large cushioned chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | [red] | x | x |
| Coffee table | x | x | x | x | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Wall art/wall mirror | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Vacuum | x | [red] | [red] | x | x | [red] |
| Telephone | x | x | x | x | [red] | x |
| | | | | | | |
| **Main Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | NOTE | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Alarm clock | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | [red] | x | x | x | x | x |
| | | | | | | |
| **Main Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| | | | | | | |
| **Misc** | | | | | | |
| Stackable washer/dryer | x | x | x | x | x | x |
| Central HVAC | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |

**611 Rock Lane Building 1**

| | 135/136 | 137/138 | 139/140 | 141/142 | 143/144 | 145/146 |
|---|---|---|---|---|---|---|
| **Lock off Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Stove top | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and four chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| | | | | | | |
| **Lock off Living Room** | | | | | | |
| Sleeper sofa | x | x | x | x | x | x |
| Coffee table | 🟥 | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Reading lamp | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Stackable washer dryer in closet | x | x | x | x | x | x |
| | | | | | | |
| **Lock off Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | 🟥 | x | x | x |
| Two side tables and lamps | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | 🟥 | x | x | x | x | x |
| | | | | | | |
| **Lock off Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |
| | | | | | | |
| **Patio** | | | | | | |
| Table and four chairs | x | x | x | x | x | x |

### 611 Rock Lane Building 2

| | 147/148 | 149/150 | 151/152 | 154/153 | 155/156 | 157/158 |
|---|---|---|---|---|---|---|
| **Main Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Oven | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and six chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| **Main Living Room** | | | | | | |
| Sofa and loveseat | x | x | x | x | x | x |
| Large cushioned chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Coffee table | x | x | x | x | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Wall art/wall mirror | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Vacuum | x | ■ | ■ | x | ■ | x |
| Telephone | x | x | x | x | x | x |
| **Main Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Chair | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Side table and lamp | x | x | x | x | x | x |
| Alarm clock | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | ■ | x | x | x | ■ | x |
| **Main Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| **Misc** | | | | | | |
| Stackable washer/dryer | x | x | x | x | x | x |
| Central HVAC | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |

| | **611 Rock Lane Building 2** | | | | | |
| | **147/148** | **149/150** | **151/152** | **154/153** | **155/156** | **157/158** |
| **Lock off Kitchen** | | | | | | |
| Refrigerator | x | x | x | x | x | x |
| Dishwasher | x | x | x | x | x | x |
| Stove top | x | x | x | x | x | x |
| Microwave | x | x | x | x | x | x |
| Kitchen table and four chairs | x | x | x | x | x | x |
| Toaster | x | x | x | x | x | x |
| Coffee maker | x | x | x | x | x | x |
| Plates, cookware and utensils | x | x | x | x | x | x |
| Fire extinguisher | x | x | x | x | x | x |
| **Lock off Living Room** | | | | | | |
| Sleeper sofa | x | x | x | x | x | x |
| Coffee table | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Reading lamp | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Stackable washer dryer in closet | x | x | x | x | x | x |
| **Lock off Bedroom** | | | | | | |
| Bed and coverings | x | x | x | x | x | x |
| Entertainment center | x | x | x | x | x | x |
| TV/VCR and/or DVD Player | x | x | x | x | x | x |
| Two side tables and lamps | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Telephone | x | ■ | x | x | x | x |
| **Lock off Bathroom** | | | | | | |
| Towels | x | x | x | x | x | x |
| misc décor | x | x | x | x | x | x |
| Water heater | x | x | x | x | x | x |
| **Patio** | | | | | | |
| Table and four chairs | x | x | x | x | x | x |

NOTE

Unit 141/142 - No TV in Main Living Room.  Two TVs in Lock off living room.  No TV in Lock off bedroom.