UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 20-41555-11 |
| YACHT CLUB VACATION OWNERS | ) | |
| ASSOCIATION, INC., | ) | Hon. Brian T. Fenimore |
| | ) | |
| Debtor. | ) | Small Business Chapter 11 proceedings |

## NOTICE OF FILING OF DEBTOR'S SECOND REVISED PLAN OF LIQUIDATION DATED NOVEMBER 23, 2020

Yacht Club Vacation Owners Association, Inc., debtor and debtor in possession, ("Debtor") submits its Second Revised Plan of Liquidation Dated November 23, 2020 (the "Second Revised Plan").

1.      Debtor initially filed its Plan of Liquidation in November 2020, and later revised the Plan with updated information ("Revised Plan"). The Revised Plan was set for confirmation hearing on April 6, 2021. The Revised Plan was accepted by ballots received April 2, 2021.

2.      The modifications to the Revised Plan in the Second Revised Plan are minor and do not affect or change any rights. Such modifications may be made after acceptance of the Revised Plan without submission to creditors and other parties in interest. *See* Adv. Comm. Note (1983) to Fed. R. Bankr. P. 3019. A copy of the Second Revised Plan is attached as **Exhibits A**.

3.      The United States Trustee and the Debtor on April 1, 2021, negotiated non-material modifications to the Revised Plan to address UST concerns (A) a liquidating small business plan should not permit the Debtor to continue to manage and operate its property post-confirmation; (B) that the case trustee, rather than an escrow agent, should make Plan distributions including Allocations to timeshare owners; and (C) particular provisions of the Revised Plan were mooted by the subsequent entry of judgment on Debtor's adversary proceeding for Section 363(h) sale

1

authority and should be deleted to avoid technical issues concerning the Court's authority to convert, terminate, or otherwise deal with the Condominiums under state law.

4.     Stonebridge Property Owners Association, Inc., which originally filed an unsecured proof of claim, amended the claim as a secured claim on March 31, 2021. Stonebridge requested the Plan be amended to recognize the claim as secured and to reclassify the claim as a Class 1 claim. The Second Revised Plan includes such recognition and treatment, as well as clarifying language regarding Active Owners and Delinquent Owners.

5.     Section 1127(a) of the Bankruptcy Code permits a plan proponent to modify its plan at any time before confirmation, so long as the plan as modified meets the requirements of 11 U.S.C. §§ 1122 and 1123. The Second Revised Plan neither misclassifies claims contrary to Section 1122 nor runs afoul of the plan content required under Section 1123.

6.      "The statute permits modifications that might technically have a negative impact on claimants where the modifications are not substantial... if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well." *In re American Solar King Corp*., 90 B.R. 808, 825 (Bankr. W.D. Tex 1988) (deemed acceptance of modified plan that reinstated creditor's entitlement to stock, resulting in dilute to other creditors.

7.     The modifications in the Second Revised Plan do not adversely change the treatment of the claim of any creditor or other party in interest who has not accepted in writing the modifications. The Court should determine that the Second Revised Plan is deemed accepted by all creditors and parties in interest who previously accepted the Revised Plan. Fed. R. Bankr. P. 3019(a).

8.      The modifications in the Second Revised Plan do not materially change the Revised

Plan as accepted by the creditors because all creditors and interest holders will still receive the

same treatment and remain in the same classes as in the Revised Plan. The changes are non-

material, and this Court should deem acceptance of the Revised Plan to be acceptance of the

Second Revised Plan

9.      The Debtor respectfully requests that the Court confirm the Second Revised Plan

without further solicitation, and provide such other and further relief as is proper.

Dated: April 5, 2021.

Respectfully submitted,


  */s/ Daniel D. Doyle*
Daniel D. Doyle          36724MO
Scott A. Pummell         66164MO
Lashly & Baer, P.C.
714 Locust Street
St. Louis, MO  63101
(314) 621-2939/(314) 621-6844 (Facsimile)
ddoyle@lashlybaer.com
spummell@lashlybaer.com

**Attorneys for Debtor**


Certificate of Service

The undersigned certifies that a true and correct copy of the foregoing was served electronically
on those requesting electronic service through the Court's ECM/ECF system on this 5th day of
April 2021.

/s/ Daniel D. Doyle

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 20-41555-11 |
| YACHT CLUB VACATION OWNERS | ) | |
| ASSOCIATION, INC., | ) | Hon. Brian T. Fenimore |
| | ) | |
| Debtor. | ) | Small Business Chapter 11 proceedings |

**YACHT CLUB VACATION OWNERS ASSOCIATION SECOND
REVISED CHAPTER 11 PLAN OF LIQUIDATION DATED NOVEMBER 23, 2020**

The Yacht Club Vacation Owners Association, Inc., debtor and debtor in possession ("Debtor" or "Association"), submits its Chapter 11 Plan of Liquidation pursuant to 11 U.S.C. § 1189.

## I.   INTRODUCTION

This is the Plan of Liquidation (the "Plan") in the small business chapter 11 case of the Debtor. This Plan is filed under chapter 11 of the Bankruptcy Code (the "Code") and proposes to pay creditors of the Debtor from cash flow from operations and the conversion and sale of its Vacation Ownership Interests ("VOIs) in a timeshare condominium after its conversion pursuant to the Plan to conventional condominiums. This Plan provides for one class of secured claims; two classes of unsecured claims; and no classes of equity security holders. Unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately 100 cents on the dollar. This Plan also provides for the payment of administrative and priority claims and potential allocations to co-owners from sale proceeds.

This Plan also provides detailed information regarding the terms for payment of the Debtor's creditors and other information designed to assist creditors and equity security holders in determining whether to accept the Plan.

**Your rights may be affected. You should read these papers. The Debtor does not warrant or represent that the information is without any inaccuracy. You should not rely on any representations except those in this Plan in determining how to vote. Each person entitled to vote on the Plan is strongly urged to consult his or her financial advisor and legal counsel before voting on the Plan.**

### A.    Purpose of This Document

This Plan describes:

- The Debtor and significant events during the bankruptcy case.

**EXHIBIT A**

- Historical information regarding the Debtor and the events leading to its bankruptcy filing.

- How the Plan proposes to pay claims you may hold if the Plan is confirmed.

- Who can vote on or object to the Plan.

- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan.

- Why the Debtor believes the Plan is feasible, and how the treatment of your claim under the Plan compares to what you would receive on your claim in liquidation.

- The effect of confirmation of the Plan.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan.  This section describes the procedures under which the Plan will or will not be confirmed.

1.      Time and Place of the Hearing to Confirm the Plan

The hearing at which the Court will consider confirmation of the Plan and determination of the adequacy of disclosures set forth in the Plan will take place telephonically at 2 p.m. April 6, 2021, in the United States Bankruptcy Court, due to pandemic restrictions.

2.      Voting Deadline

If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Daniel D. Doyle, Lashly & Baer, P.C., 714 Locust Street, St. Louis MO 63101, or you may email the ballot to ddoyle@lashlybaer.com. See below for a discussion of voting eligibility requirements. Your ballot must be **received** by 5 p.m. April 2, 2021, or it will not be counted.

3.      Deadline For Objecting to Confirmation of the Plan

Objections to the adequacy of the disclosures stated in this Plan and to confirmation of the Plan must be filed with the Court and served upon the undersigned counsel for the Debtor and the United States Trustee by 5 p.m. April 2, 2020.

**II.      BACKGROUND**

**A.      Description and History of the Debtor's Business**

The Association was incorporated under Missouri law on March 19, 2001, as a not-for-profit corporation for the purpose of managing, operating, and maintaining a 12-unit timeshare condominium resort located at 611 Rock Lane Drive, Branson, Missouri (the "Facility" or

"Condominiums") within the StoneBridge Village community. The Facility has lakefront condominium units overlooking Table Rock Lake at Indian Point.

The timeshare Condominiums are subject to a recorded Supplemental Declaration of Covenants and restriction for the Yacht Club Condominiums, dated March 27, 2002, ("Decl." or "Declaration") to which the Debtor is successor in interest to the declarant. A copy of the Declaration may be reviewed online at www.Bransonyachtclub.com/owners/Declaration.

As of August 10, 2020 the Debtor owned 31 deeded VOIs[1] through foreclosure or surrender; individuals owned 641 deeded VOIs; and 434 deeded VOIs were beneficially owned by Festiva Adventure Travel Club Members' Association (the "Club") through Chicago Title Company as trustee.

Festiva Development Group, Inc., ("Festiva") is the declarant of the Club and a subsidiary of Zealandia Holdings Company, Inc. ("Zealandia"). Festiva's CEO, Herbert H. Patrick, Jr., also serves as the Debtor's president. The Facility is managed by LaTour Hotels and Resorts, Inc., ("LaTour") which collected and disbursed funds and provides supervisory and maintenance service to the Facility. LaTour is a wholly owned subsidiary of Zealandia. LaTour employees serve as the Debtor's other two directors.

The Association's management agreement with LaTour provides for a fee based on 10% of annual revenues, including reserves less annual rental income and bad debt expense. Management fees incurred under this agreement totaled $36,960 in 2018. The management company also charges accounting fees to the Association, which totaled $10,584 in 2018. The Association pays LaTour a monthly Facility and owner services fee to cover the cost of customer and member services, maintaining the website, reservations, and marketing, which totaled $9,012 in 2018.

## B.      Insiders of the Debtor

Herbert H. Patrick, Jr. – President; Kevin Blocker – Secretary & Treasurer; and Scott Styron – Vice President.  All serve with without compensation.

## C.      Management of the Debtor Before and During the Bankruptcy

During the two years before the Debtor's bankruptcy petition was filed, the officers, directors, managers or other persons in control of the Debtor (collectively, the "Managers") were Herbert H. Patrick, Jr. – President ; Kevin Blocker – Secretary & Treasurer; Scott Styron – Vice President. LaTour was employed to manage the Facility. The Managers of the Debtor during the Debtor's chapter 11 case will remain the same.

---

[1] For Plan purposes, VOIs include rights in the Condominium units, common elements, limited common elements, and common furnishings.

**D.     Events Leading to the Debtor's Chapter 11 Filing**

The Association's governing documents contain limitations and restrictions on the use of cash. The Association maintains two funds to ensure it is meeting the requirements of its governing documents: (a) the Operating Fund holding cash available for the general operations of the Association; and (b) the Replacement Fund used to accumulate cash earmarked for future major repairs and replacements to the Facility.

By December 31, 2018, the Operating Account had incurred a deficit of $192,992, which was paid with funds borrowed from the Replacement Fund. See December 31, 2018, audit report.  Its balance sheet as of July 31, 2020, showed a fund deficit of $307,721.

VOI owners owe Debtor more than $1,000,000 in delinquent assessments. The delinquent assessments and travel restrictions imposed due to Covid-19 pandemic caused the Debtor to exhaust the Replacement Fund to cover operating expenses.  Payment of the delinquent assessments is secured by liens on the respective VOI interests by operation of state law and Article 11.9 of the Declaration.

The Debtor, as of the Petition Date, owed Creditors more than $120,000 in accounts payable. It had some $36,667 in cash and carried $184,183 in potentially collectable accounts receivable from Delinquent Owners (defined below) of timeshare intervals.

As a result, continuing to defer maintenance and repairs will detrimentally affect the Facility in the near future due to Debtor's inability to replenish the Replacement Fund with timeshare fees and assessments.

The Association generated operating revenues primarily through collection of assessments from VOI owners, and secondarily through rentals. The Association halted timeshare and leasing activities for the Facility to minimize expenses for housekeeping and other costs before filing this case.

The Facility's stairways were flagged for replacement in early 2020. Estimates to replace the stairways were $50,000 to $60,000, which the Association was unable to pay due to lack of timeshare maintenance fees from delinquent members. As a result, the Association decided in early 2020 to cease taking reservations for its members and leases to vacation at the facility. The Association subsequently determined it would not invoice members for future maintenance fees and stopped members' monthly electronic funds payments for the 2021 maintenance fees.

Given the inability of timeshare revenue to fund the repair and upkeep of the Facility, the Debtor believes the highest and best use, with the greatest potential return to the Debtor and other co-owners, is for the Facility to be marketed and sold as conventional condominium units in its as-is condition.  The Debtor believes the property, if sold as conventional condominiums, may be worth some $1.2 million. Absent such a sale, the Association believes, the Facility could not be

repaired or maintained and could not be sold due to lack of marketable title stemming from undivided deeded interests in the property held by hundreds of timeshare owners.

The Association believes the only means to pay creditors and realize any value for its interests in the Facility and the interests of VOI co-owners is to convert and sell the Facility as conventional condominiums.

Because a substantial number of Delinquent Owners cannot now be located and may have transferred VOIs to "timeshare exit" entities without the required notice to the Association,[2] approval of the conversion and sale by 80% of all VOI Owners pursuant to its bylaws is impossible to achieve; without a sale, the unrepaired Condominiums would be left to deteriorate as the Association quickly runs out of money to keep up the property that it would be unable to sell.

**E.      Significant Events During the Bankruptcy Case**

The Association filed its petition for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.) on August 28, 2020 ("Petition Date") in the United States Bankruptcy Court for the Western District of Missouri, Southwestern Division. The Debtor elected for reorganization under Subchapter V of Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 1181-1195) as a small business debtor.

The Bankruptcy Court authorized the Debtor to obtain a $125,000 line of credit from LaTour to allow the Debtor to pay for maintenance and management of the Facility. LaTour had loaned the Association $25,000 pre-bankruptcy to enable the Debtor to hire bankruptcy counsel and to file the Petition. The financing will be paid on an administrative priority basis through the Plan.

The Bankruptcy Court authorized the Debtor to provide constructive notice of the Plan confirmation hearing to unknown delinquent VOI owners through publication in the Branson Tri-Lakes News, a newspaper covering the Branson, Missouri, region, and to limit notice to timeshare owners to matters involving confirmation of the Plan and of the Debtor's action to sell the Facility, including the undivided interests of VOI holders, under Section 363(h) of the Bankruptcy Code (discussed below).

The Debtor filed and adversary proceeding seeking approval of the Sale of the Condominiums under Section 363(h) of the Bankruptcy Code. A copy of the adversary complaint may be accessed at www.Bransonyachtclub.com/owners/Adversary. The Bankruptcy Court entered judgment for the Debtor on February 25, 2021, to permit the sale of all VOI interests pursuant to 11 U.S.C. § 363(h) with the interests to attach to the sale proceeds.

The Bankruptcy Court approved sale and bidding procedures for the auction of the Facility on

---

[2] A common tactic of timeshare exit companies is to require the owner to pay a fee to transfer timeshare interests into a shell company that by design is *incommunicado*.

February 25, 2021, including approval of a stalking horse bid of $1.1 million for the Facility. An appraisal ordered during the bankruptcy proceedings indicated the fair market value of the Facility as-is may be $1.84 million. The on-line auction is scheduled for April 21, 2021.

**F.      Projected Recovery of Avoidable Transfers**

The Debtor at this time does not plan to pursue any preference, fraudulent conveyance, or other avoidance actions.

**G.      Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.

**H.      Current and Historical Financial Conditions**

The Debtor's sole assets are cash on hand, 31 VOIs of unknown value, and accounts receivable due from delinquent VOI owners. Historically, the Debtor has operated with a deficit due to the failure of timeshare owners to pay maintenance fees and assessments over a period of years.

## III.      THE PLAN AND TREATMENT OF CLAIMS

The Plan proposes (A) to obtain Bankruptcy Court authority to convert the Facility from a timeshare community to a condominium complex with marketable title; (B) to pay the costs of the sale from the condominium sale proceeds; (C) to surcharge the proceeds to pay administrative claims, including the Debtor in Possession ("DIP") Loan; (D) to pay unsecured claims from sale proceeds attributable to Debtor's VOIs and from amounts set off from Allocations that otherwise would be due Delinquent Owners; and (E) to distribute that balance *pro rata* to VOI Owners (defined below).

Amounts shall be disbursed as soon as practicable after the closing of the last condominium unit sale; the Trustee (defined below) shall receive all Debtor's cash to increase the Allocation to VOI Owners after payment of unsecured claims and administrative expenses. The Trustee (A) shall receive and disburse all Sale Proceeds, including amounts paid held for the benefit of VOI owners; (B) shall be paid all Cash held by the Debtor on the Sale Date; and (C) shall receive and disburse all Allocations on behalf of Debtor attributable to (i) Debtor's VOIs; and (ii) setoffs of Allocations that otherwise would be due from Delinquent Owners.

If the Trustee is unable after reasonable efforts to locate any VOI owner after 90 days, the Escrow agent shall allocate the undistributed funds to VOI owners with known addresses and identities.

The sale of the undivided joint interests, both VOIs owned by the Debtor and those owned by others, would be achieved through a separate legal action filed in the Bankruptcy Court pursuant to 11 U.S.C. § 363(h). The sale may occur before or after Plan confirmation and may be contingent on Plan confirmation.

**A.      What is the Purpose of the Plan?**

The Plan provides for the judicial termination of the Association prior to the Sale, allowing the Association hold title to the Facility in trust under state law for timeshare owners through the Sale Date; provides for the Sale in conjunction with a separate lawsuit seeking Court authority to sell all VOI interests in the Facility; and accommodates payments of Sale Proceeds and any Cash then held by the Association to administrative claimants, creditors, and VOI owners.

As required by the Code, the Plan places claims in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan, which is determined by the Sale Proceeds.

**B.      Explanation of Classes of Claims and Equity Interests**

1.     Classes of Secured Claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under Code § 506. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

          2.      Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code §§ 507(a)(1), (4), (5), (6), and (7) are required to be placed in classes.  The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim.  However, a class of holders of such claims may vote to accept different treatment.

          3.      Class of General Unsecured Claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under Code § 507(a).

          4.      Equity Interest Holders

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor.  Because the Debtor is a nonprofit corporation with no equity issued, there are no equity holders to be classified.

5.      Active and Delinquent VOI Owners

"Active Owners" are Association members current in their payment of maintenance fees and assessments to the Association as of the Sale Date of the Condominiums, including the Association itself. "Delinquent Owners" are Association members who are <u>not</u> current in their payment of maintenance fees and assessments to the Association as of the Sale Date of the Condominiums.

Deeded timeshare interests of Active Owners and Delinquent Owners are undivided co-ownerships of the Facility with the Debtor; the VOIs are not subject to Plan classification because they are neither Claims against the Debtor nor equity interests in the Debtor. The Trustee will pay the Active Owners as undivided joint owners of the Facility from the proceeds of the Plan's proposed post-confirmation 363(h) sale of the Facility as described below. Nevertheless, VOI owners will receive notice of the Plan confirmation and have the opportunity to object as parties in interest at the confirmation hearing; and they will receive notice of the actual post-confirmation Sale and be afforded an opportunity to object to the actual terms of the proposed Sale.  To the extent necessary, a VOI owner's failure to object to confirmation of the Plan will constitute the VOI owners' affirmation and approval of the conversion of the Facility from timeshare condominiums to convention condominiums and preliminarily authorize the sale of the Condominiums.

## C.      Overview - Treatment of Claims and Interests under Plan

Plan treatment of claims and interests are as follows:

| Class | Impairment | Treatment |
|---|---|---|
|  |  |  |
| Class 1: Secured Claims | Unimpaired | Will be paid in full on the Effective Date (as defined in Article VI.B below).. |
| Class 2: Priority Unsecured Claims | Unimpaired | Will be paid in full on the Sale Date (defined below) from Sale Proceeds or when due, whichever is earlier. Debtor believes this class consists of accruing local real estate taxes for the Facility. |
| Class 3: Unsecured Claims | Impaired | Will be paid *pro rata* as soon as practicable after the Sale Date. |

## D.      Treatment of Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  Accordingly, the following claims are not classified:

1.      Administrative Expenses

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under Code § 507(a)(2).  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that each administrative expense claim be paid on the effective date of the Plan, unless the holder of the claim agrees to a different treatment.  As reflected below, each holder of an administrative expense claim allowed under Code § 503 will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

The following chart lists the Debtor's estimated administrative expenses and their treatment under this Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
| --- | --- | --- |
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $ 0 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | $0 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Court | $70,000 (est.) plus sales commission on Sale of the Facility | Paid in full no later than the Sale Date, subject to interim fee payments as permitted by the court, or according to court order if such fees have not been approved by the Court on the Effective Date |
| Clerk's Office Fees | unknown | Paid in full on the Effective Date |
| Other administrative expenses, including DIP Loan | $150,000 (est.) | Paid in full as soon practicable after the Sale Date |

9

2.      Priority Tax Claims

Priority tax claims are unsecured income, employment, and other taxes described by Code §
507(a)(8).  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must
receive the present value of such claim, in regular installments paid over a period not exceeding
5 years from the order of relief.

3.      Class 1: Secured Claims

The only secured claim is in the amount of $18,000, plus attorneys' fees and costs, held by the
Stonebridge Property Owners Association, Inc. The secured claim  will be paid in full on the
Effective Date. Class 1 is unimpaired.

4.      Class 2: Priority Unsecured Claims.

All allowed claims entitled to priority under Code § 507 (except administrative expense claims
under § 507(a)(2 and priority tax claims under Code § 507(a)(8)) will be paid on the Effective
Date, if any.  Class 2 is unimpaired

5.      Class 3: Allowed Unsecured Claims

Unsecured claims allowed under Code § 502 (other than Class 2 Priority Claims) will be paid in
pro rata in cash no later than as soon as practicable after the Sale Date.  Class 3 is impaired.

## IV.    ALLOWANCE AND DISALLOWANCE OF CLAIMS

**A.    Disputed Claims**

A disputed claim is a claim that has not been allowed. A claim may not be allowed if (i) a proof
of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an
objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as
disputed, contingent, or liquidated. No distribution will be made to holders of disputed claims
unless such claim is later allowed.

**B.    Settlement of Disputed Claims**

The Debtor will have the power and authority to settle and compromise a disputed claim with
court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## V.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    Assumed Executory Contracts and Unexpired Leases**

10

The Debtor or Trustee may assume and assign any executory contract or unexpired lease to purchasers of the Condominiums or their association by indication of such assumption and assignment in a Sale agreement prior to the Sale Date. The Debtor may cure any default in any such executory contract or unexpired lease in conjunction with such assumption and assignment, or require the purchaser to cure any such default immediately after the Sale Date. If you object to the assumption of your contract or lease, you must object to the Sale within the deadline to be set by the Court or you will be deemed to accept the assumption and assignment proposed in the relevant Purchase Agreement.

## B.     Rejected Executory Contracts and Unexpired Leases

The Debtor or Trustee will be conclusively deemed to have rejected all executory contracts and unexpired leases on the Sale Date unless they are assumed and assigned to a purchaser of the Condominiums. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section of this Plan must be filed no later than thirty (30) days after the Sale Date. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

## VI.     GENERAL PROVISIONS

## A.     Definitions and Rules of Construction

The definitions and rules of construction stated in Code §§ 101 and 102 apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the defined terms herein and by the following definitions:

*Active Owners* means those VOI Owners who are current in their payment of maintenance fees and assessments to the Association as of the Sale Date, including the Association.

*Allocation* means the Cash obtained from Net Sale Proceeds and other sources that is allocated to Active Owners and Delinquent Owners (subject to setoff).

*Assets* means all Property of the Estate, including Assets acquired after Plan confirmation but before closure, dismissal or conversion of the case pursuant to 11 U.S.C. § 1186.

*Association Funds* means the Net Sale Proceeds and all Cash held by the Trustee for the Association or held by the Association.

*Cash* means currency, check, draft, wire transfer, or money.

*Code* means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

11

*Delinquent Owners* means those VOI Owners who are not current in their payment of maintenance fees and assessments to the Association as of the Sale Date.

*DIP Loan* means Debtor's $125,000 post-bankruptcy line of credit with LaTour Hotels and Resorts, Inc., as later may be amended.

*Distributions* means Cash payments made on Allowed Claims through the Plan.

*Net Sale Proceeds* means the Sale Proceeds remaining after payment of costs of sale, Administrative Claims (including the DIP Loan and Professionals' fees), and Allowed Claims.

*Property of the Estate* is defined by 11 U.S.C. § 1186.

*Sale* means the sale of the Facility pursuant to Section 363(h) of the Code and the Plan.

*Sale Date* means the date on which the last sale of any portion of the Facilities is closed or the date all Sale Proceeds are received by the Trustee, whichever is later.

*Sale Motion* means a legal action seeking a Court order authorizing the sale of the Facility free and clear of liens, claims, encumbrances and other interests pursuant to 11 U.S.C. §§ 363, including the undivided interests of co-owners, either as condominium complex or as individual condominiums, pursuant to Section 363(h) of the Code.

*Trustee* means the Subchapter V case trustee.

*VOI Owners* means all Active Owners and Delinquent Owners.

## B.      Effective Date of Plan

The effective date of this Plan shall be the day immediately following the Sale Date. But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, unless the confirmation order has been vacated.

## C.      Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

## D.      Binding Effect

This Plan will be binding upon and will inure to the benefit of the successors or assigns of any person or entity receiving any Plan treatment of its rights, interest, or obligations.

## VII.    PLAN TERMS

The Plan shall require:

**A.**      [Deleted.]

**B.**      **Sale.** The Debtor shall market and sell the Facility in compliance with the Sale Order. The Trustee shall make all distributions provided for under the Plan. The Trustee shall determine and distribute the Allocations.

**C.**      [Deleted.]

**D.**      **Recordation**. Debtor, Creditors, and counterparties shall execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate the Plan, including the termination of condominium and the Sale.

**E.**      **Continued Management Through Sale Date**. Debtor shall continue to manage and maintain the Facility using DIP Loan proceeds and cash on hand through the Sale Date. The Debtor shall continue in existence until all Sale proceeds are distributed.

**F.**      **Payment of Sale Costs and Administrative Expenses**. Sale Proceeds shall first pay the costs of the Sale, the DIP Loan, and any other unpaid administrative expenses as surcharges on the interests of all VOI owners as an extraordinary special assessment on under Decl. Art. 1.1(b).

**G.**      **Payment of Class 3 Claims from Debtor's Proceeds**. Net Sale Proceeds allocable to Debtor's VOIs and proceeds of setoffs shall pay Class 3 Unsecured Claims as liens on the Net Sale Proceeds pursuant to Mo. Rev. Stat. § 448.2-118.7, to the extent Cash or other Property of the Estate is insufficient to pay Class 3 claims in full.

**H.**      **Payment of Class 3 Claims by Surcharge or Special Assessment**. If Net Sale Proceeds attributable to Debtor's VOIs, including setoffs from Allocations otherwise due Delinquent Owners, from Debtor's VOIs are insufficient to pay Class 3 Unsecured Claims in Full, any deficiency will be paid from the Sale Proceeds as a special assessment levied by the Association.

**I.**      **Debtor Surplus Proceeds and Cash on Hand.** If Net Sale Proceeds allocable to Debtor's VOIs, including setoff proceeds, are greater than the amount of unpaid Class 3 Claims, any surplus Net Sale Proceeds shall pay Allocations to Active Owners and Delinquent Owners (subject to setoff). On the Sale Date,  all sale proceeds shall be paid over to the Trustee. .

**I.**      **Calculation of Allocations.** All VOI Owners shall be entitled to each receive a percentage of the Net Sale Proceeds from Escrow calculated by: (1) Totaling the number of bedrooms each VOIs owner is entitled to occupy each year; (2) multiplying that number by the number of weeks per year each VOI owner is entitled to occupy the unit(s), with biennial VOIs multiplied by one-half week;  and (3) dividing the number of VOIs held by each Owner by the total number of bedrooms per year available to all VOI owners each year ("Allocation Units").

**J.**      **Setoffs against Allocations to Delinquent Owners.** Allocations to each Delinquent

Owner shall be first set off by all amounts each respective Delinquent Owner owes to the Association, including unpaid maintenance fees, as of the Sale Date. Delinquent Owners who bring past due amounts current prior to the Sale Date, however, shall receive Allocations of Net Sale Proceeds as Active Owners.

**K.      Debtor and Affiliates Ineligible to Bid**. The Association, its board members, and any affiliates of the board members shall not be eligible to bid for or to purchase the Facility.

**L.      Trustee to Distribute Sale Proceeds**. The Trustee shall receive and distribute all Sale Proceeds pursuant to the Plan.

M.      [Deleted.]

**N.      Unclaimed Amounts**. If any Distribution or Allocation remains unclaimed for ninety (90) days after it has been delivered (or after such delivery has been attempted), it shall be forfeited by such Creditor or VOI Owner and will become Cash available for distribution to other Creditors or VOI Owners.

**O.      Disputed Identity of VOI Owner**. If any dispute arises as to the identity of a current VOI Owner who is to receive any Allocation, the Trustee may withhold such Allocation until resolution by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

**P.      Uncashed Checks.**  If any check issued under the Plan shall remain uncashed for 90 days, the check shall be canceled and the amount of each such check shall be forfeited and returned to the Trustee for further distribution.

**Q.      Potential Remedy if Plan Confirmed Despite Non-Accepting Impaired Class.** If the Plan is confirmed through "cramdown" under 11 U.S.C. § 1191 despite an impaired Class that does not accept the Plan, Creditors shall have remedies if the Plan later fails. If the Debtor or Trustee is unable to sell the Condominiums within 18 months after the Effective Date, any impaired Creditor may obtain immediate liquidation of all assets held by the Debtor through written demand filed with the Court, require the Trustee's disbursement of the proceeds of all such assets, and the Association will cease to exist after transfer of all such assets to the Trustee.

### VIII.   MEANS OF IMPLEMENTING THE PLAN

**A.      Sources of Payments**

Payments and distributions under the Plan will be funded by cash on hand, Sale Proceeds allocated to the Association's VOIs, possible special assessments, and setoffs against Allocations of Net Sale Proceeds to Delinquent Owners. The Debtor may levy a special assessment against the Allocations of all VOI owners only if Debtor's cash, its own Allocations, lien proceeds, and setoff proceeds are insufficient to pay in full all Claims, including Administrative Claims. Any

14

surplus funds held by the Debtor after the Sale will be deposited into Escrow to fund Allocations.

## B.      Post-Confirmation Management

The Post-Confirmation Managers of the Debtor will be the Board of Directors, identified above, who will continue to serve without compensation. They will be discharged of all duties on the later of (1) the day following the Sale Date; or (2) the day after the transfer of Debtor's Cash to the Trustee.

## C.      Risk Factors

The proposed Plan is not guaranteed as to results, and faces risks that include (A) depressed real estate values, including sale prices for condominiums and condominium complexes in the region, due to market conditions and a continued pandemic; (B) unforeseen costs of case administration that may render the Debtor unable to make the anticipated payments, Distributions and Allocations; and (C) inability to locate a buyer for the Condominiums due to disruption of national or regional credit markets.

## D.      Tax Consequences of Plan

Creditors and equity interest holders concerned with how the Plan may affect their tax liability are <u>strongly</u> urged to consult with their accountants, attorneys, or advisors.  The Plan is expected to result in no tax consequences to the Debtor due to its nonprofit status; (1) because there is anticipated discharge of debt, no general tax consequences on creditors should result; and (2) because debts should be repaid in full as a consequence of receiving of Plan consideration after confirmation, profits derived from such payments should be taxed as ordinary business profits. Allocations of Net Proceeds to VOI owners may result in recognized gains or losses, depending on the tax basis of their respective VOIs.

## IX.      CONFIRMATION REQUIREMENTS AND PROCEDURES

## A.      Overview of Requirements

To be confirmable, the Plan must meet the requirements in Code § 1191. These include requirements that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

## B.      Who May Vote or Object

Any party in interest, including VOI owners, may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, including most VOI owners, are not entitled to vote to accept or reject the Plan.  A creditor has a right to vote for or against the Plan only if that creditor has a claim that is both (1) allowed or allowed for voting purposes and (2) impaired.

15

**C.     What Is an Allowed Claim?**

Only a creditor with an allowed claim has the right to vote on the Plan.  Generally, a claim is allowed if either (l) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.  When a claim is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court overrules the objection or allows the claim for voting purposes under Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

The deadline for filing a proof of claim in this case was November 6, 2020.

The deadline for filing objections to claims is the thirty-first day after the Effective Date.

**D.     What Is an Impaired Claim?**

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is impaired under the Plan.  As provided in Code § 1124, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

**E.     Who is Not Entitled to Vote**

The following are not entitled to vote:

1.  Holders of claims that have been disallowed by an order of the Court.

2.  Holders of other claims that are not "allowed claims" (as discussed above), unless they have been "allowed" for voting purposes.

3.  Holders of claims in unimpaired classes.

4.  Holders of claims entitled to priority pursuant to Code §§ 507(a)(2), (a)(3), and (a)(8).

5.  Holders of claims in classes that do not receive or retain any value under the Plan.

6.  Holders of administrative expense claims.

7.  Parties in interest who are neither creditors nor equity holders, including VOI owners.

Even if you are not entitled to vote on the Plan you have a right to object to the confirmation of the Plan.

**F.     Who Can Vote in More Than One Class**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim. Debtor believes no creditor holds a

secured claim.

**G.     Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court may confirm the Plan as "consensual" if the impaired classes accept the Plan. A plan that cannot be confirmed consensually under 11 U.S.C. § 1191(a) may still be confirmed non-consensually (i.e., by "cramdown") if the requirements of 11 U.S.C. § 1191(b) are met.

>       1.     Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

>       2.     Treatment of Nonaccepting Classes

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan. To confirm a subchapter V plan non-consensually under Code Section 1191(b), the court must find that the plan does not discriminate unfairly, and that the plan is fair and equitable with respect to each class of impaired claims that has not accepted the plan.

**H.     Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as **Exhibit A**.

**I.     Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. Liquidation is the aim of the Plan.

**J.     Ability to Initially Fund Plan**

The Plan Proponent believes that the Trustee will have enough cash available on the Effective Date of the Plan to pay all claims and expenses entitled to be paid no later than the Effective Date. **K.     Ability to Make Plan Payments**

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.  In this liquidating Chapter 11 plan, the Debtor believes that

17

the DIP Loan will be sufficient to maintain the Facility and close its auction sale by June 1, 2021. The Debtor's updated four-month budget through June 2021 is attached as **Exhibit B.**

You should consult with your accountant or other financial advisor if you have any questions pertaining to these financial projections.

### X.    EFFECT OF CONFIRMATION OF PLAN

**A.    No Discharge of Debtor**

Pursuant to Code § 1141(d)(3), the Debtor will not receive any discharge of debt in this bankruptcy case.

**B.    Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan.  However, the Court may require another vote on the Plan if the modification is material.

**C.    Final Decree**

Once all Distributions and Allocations have been made and the estate has been fully administered, the Trustee or such other party as the Court shall designate in the Confirmation Order shall file a motion with the Court to obtain a final decree to close the case, or the Court may enter a final decree on its own motion.

Dated: November 23, 2020.

Revised April 1, 2021.

/s/ Herbert H. Patrick, Jr.
Herbert H. Patrick, Jr.
President

By: */s/ Daniel D. Doyle*
Daniel D. Doyle        36724MO
Scott H. Pummell       66164MO
LASHLY & BAER, P.C.
714 Locust Street
St. Louis, MO  63101
Telephone: (314) 621-2939
FAX:  (314) 621-6844
ddoyle@lashlybaer.com
spummell@lashlybaer.com

*Counsel for Debtor*

18